**DATAPOINT CORPORATION,**
**Plaintiff-Appellant,**

v.

**LEE WAY MOTOR FREIGHT, INC.,**
**Defendant-Appellee.**

**No. 76–2599.**

United States Court of Appeals,
Fifth Circuit.

May 15, 1978.

---

F. W. Baker, John D. Fisch, San Antonio, Tex., for plaintiff-appellant.

Tom Alexander, Roger A. Rider, Houston, Tex., for defendant-appellee.

Before COWEN *, Senior Judge, GOLDBERG and AINSWORTH, Circuit Judges.

AINSWORTH, Circuit Judge:

Plaintiff Datapoint Corporation delivered eight sealed cartons which were described in the Uniform Straight Bill of Lading as "elec. equip." to defendant Lee Way Motor Freight, Inc. at San Antonio on October 17, 1974, for shipment to United Founders Life Insurance Company in Oklahoma City. United Founders Life Insurance Company refused delivery, and the shipment was returned to the carrier's Oklahoma City terminal. Lee Way then sent Datapoint by certified mail with return receipt requested, a "Notice of Undelivered or Refused Freight" which informed Datapoint that

* Senior Judge of the United States Court of Claims, sitting by designation.

# 1130

Lee Way would "exercise the applicable provisions of the bill of lading" if the shipment was not claimed and the storage charges paid.

Although Datapoint received the notice, it failed to claim the shipment, probably due to clerical mistake within Datapoint's organization. In late November, having heard nothing from Datapoint, Lee Way turned the cartons of freight over to an independent contractor, James Wilmoth, to auction the freight to pay the accrued storage charges of $200. On November 28 and December 5, 1974, Wilmoth advertised in the Bechnay Tribune Review, the smallest of three local papers, that the unclaimed freight would be sold on December 5. Wilmoth described the freight as "8 ctn. elec. equip." exactly as the shipment had been described in the bill of lading. Because less than five bidders appeared for the auction on December 5, Wilmoth orally announced that the goods would be sold later, on December 12. At that later auction, which fifteen to twenty bidders attended, Wilmoth himself purchased the shipment for $5,000.[1]

Datapoint sued Lee Way in the Texas state courts to recover damages caused by Lee Way's alleged breach of the provisions of the Uniform Straight Bill of Lading and conversion of Datapoint's property. Lee Way removed the suit to the Federal District Court for the Western District of Tex-

as. At the close of Datapoint's case, the district judge granted a directed verdict for Lee Way. Datapoint appeals the granting of a directed verdict in favor of Lee Way and the denying of its motions for a directed verdict in its favor or for a judgment notwithstanding the verdict. Datapoint claims it is entitled to relief because it has allegedly shown six irregularities in the sale of its goods: 1) the freight was auctioned by Wilmoth, an independent contractor, although the bill of lading required that the carrier sell the goods; 2) no notice of the December 12 sale was published as required by the bill of lading; 3) the notice of refused delivery sent by Lee Way to Datapoint did not explicitly state that Lee Way would sell the merchandise; 4) the notice for the sale was published in a paper with a circulation smaller than that of two other papers; 5) the advertisement described the goods only as "8 ctn. elec. equip." although the cartons were labeled "Data Processing Equipment"; 6) the sale was conducted by a person who also made purchases for his own account.

■ We conclude that the district judge was correct in directing a verdict for the defendant. The decision in this case depends on whether Lee Way's conduct was within the terms of the Uniform Straight Bill of Lading.[2] The interpretation of this widely used bill of lading, which was promulgated by the Interstate Commerce Com-

1. The market value of the shipment is unclear. One of Datapoint's witnesses testified that the equipment was worth approximately $40,000. However, the record also indicates that the shipment has been sold several times since the December 12 auction with the last sale bringing a price of only $15,000.

2. The Uniform Straight Bill of Lading reads in relevant part:
"Sec. 4(b) Where nonperishable property which has been transported to destination hereunder is refused by consignee or the party entitled to receive it upon tender of delivery, or said consignee or party entitled to receive it fails to receive or claim it within 15 days after notice of arrival shall have been duly sent or given, the carrier may sell the same at public auction to the highest bidder, at such place as may be designated by the carrier.

"PROVIDED, That the carrier shall have first mailed, sent, or given to the consignor notice that the property has been refused or remains unclaimed, as the case may be, and that it will be subject to sale under the terms of the bill of lading if disposition be not arranged for, and shall have published notice containing a description of the property, the name of the party to whom consigned, or if shipped order notify, the name of the party to be notified and the time and place of sale, once a week for two successive weeks, in a newspaper of general circulation at the place of sale or nearest place where such newspaper is published. PROVIDED, that 30 days shall have elapsed before publication of notice of sale after said notice that the property was refused or remains unclaimed was mailed, sent or given."

mission for interstate shipments, has been held to be a matter of federal law. *See, e. g., Illinois Steel Co. v. Baltimore & Ohio R.R.,* 320 U.S. 508, 64 S.Ct. 322, 88 L.Ed. 259 (1943). However, while the parties have cited several cases interpreting other provisions of the bill of lading, *see generally, e. g., Atchison T. & S.F. Ry. v. Midland Cooperatives, Inc.,* W.D.Okl., 1969, 306 F.Supp. 723; *Pennsylvania R.R. v. Greene,* S.D.Ala., 1959, 173 F.Supp. 657, no cases have been found that specifically interpret the provisions of the relevant section 4(b) of the Uniform Straight Bill of Lading. Having examined Lee Way's actions in this case, we conclude that the defendant's conduct was commercially reasonable and complied with the provisions of the bill.

■ Datapoint's first contention that Lee Way violated the provisions of the bill of lading by entrusting the auction to Wilmoth, an independent auctioneer, rests on an unnecessarily narrow construction of the word "carrier" in the bill. Nothing would indicate that the consignor would normally have any special reliance on the carrier's ability to conduct auctions. A professional auctioneer would be preferable to the carrier because many carriers lack experienced personnel and facilities to conduct optimal public sales. In addition, the auctioneer would have no less incentive than the carrier to seek the highest price for the unclaimed shipment. Hence, construing this provision is analogous to construing an ordinary contract where performance by a third party can discharge one's contractual obligations. *See generally* 4 Corbin on Contracts § 865 (1951). Of course, turning the shipment over to an independent auctioneer for sale would not discharge the carrier's obligations if the auctioneer fails to conduct the sale properly. However, in this case, the performance of Wilmoth, an experienced auctioneer who has conducted over five thousand auctions, has not been proven irregular in any aspect.

■ The next objection that Datapoint raises is that the notice of the December 12 sale was not published as required by the bill of lading. Adequate notice of the sale is important to ensure that the unclaimed goods will be sold at a fair price. Wilmoth did publish the required notice for a sale of the goods on December 5 but he postponed the sale for a week because less than five persons appeared for the auction on that date. Had Wilmoth chosen to conduct the sale on December 5 instead of announcing that the sale would be held the next week Wilmoth would have clearly complied with the publication requirements but with only a few bidders Datapoint might have received a lower price for its goods. Since all the bidders present on December 5 were again present on December 12, plus many others, we conclude that conducting the sale a week later than originally advertised did not violate the provisions of the bill of lading.

■ In its remaining contentions, Datapoint complains that Lee Way's compliance with the Uniform Straight Bill of Lading was not commercially reasonable although Datapoint did not prove that Lee Way's actions differed from the customary practices in the industry. We find that Lee Way's conduct was reasonable. In describing the unclaimed freight in the advertisement, the shipment was referred to as "8 ctn. elec. equip." exactly as Datapoint itself had described it in the bill of lading.[3] We decline to hold the carrier to a higher standard than the consignor in describing the nature of his shipment. The notice of sale appeared twice in a newspaper of general

**3.** Datapoint's brief states that the contents of the packages was clearly described as electronic data processing equipment on the outside of the cartons. However, this contention is not supported by its citations to the record and the portions of cartons included as exhibits do not contain the words data processing. Even if the cartons were so marked, the inclusion of the term data processing in the notice of sale would not have significantly clarified the nature of the equipment since data processing equipment includes a range of devices such as central processing units, magnetic tape drives, line printers, card readers or remote terminals. The value of the shipment to a prospective buyer would depend upon the kind of equipment involved.

circulation as required by section 4(b) of the Uniform Straight Bill of Lading. Nothing obligated Lee Way to advertise in the paper with the largest circulation. In commercial transactions the mere fact that the sale might have been conducted in a different manner is not evidence that the sale was conducted unreasonably. *See generally* Uniform Commercial Code § 7–308(1). The letter to Datapoint stating that Lee Way would "exercise the applicable provisions of the bill of lading" if the shipment was not claimed was adequate to inform Datapoint that the equipment would be subject to sale. Datapoint's own witness, Horace Taylor, admitted that he would have known from Lee Way's letter that a sale was contemplated. Finally, the fact that Wilmoth bid at these auctions for his own account is not commercially unreasonable since that practice is explicitly permitted for similar sales under the Uniform Commercial Code. *See* Uniform Commercial Code § 7–308(3). Further, it should be noted that Wilmoth's final bid for the shipment was $900 above any previous bid.

The parties do not dispute the facts relevant to the application of this interpretation of the Uniform Straight Bill of Lading. The parties stipulated to many of the facts involved. Since conflicting evidence and credibility of witnesses are not at issue and since the facts and inferences point so strongly in favor of Lee Way, the district judge was correct in directing a verdict. *See Boeing Company v. Shipman,* 5 Cir., 1969, 411 F.2d 365, 374.

AFFIRMED.