SOUTHERN PACIFIC TRANSPORTA-
TION CO., Plaintiff,

v.

UNITED STATES of America,
Defendant.

Civ. No. R–77–0180.

United States District Court,
E. D. California.

Nov. 28, 1978.

See also D.C., 462 F.Supp. 1227.

James V. Diepenbrock, Jack V. Lovell, Jr., Carol A. Huddleston, Charity Kenyon, Diepenbrock, Wulff, Plant & Hannegan, Sacramento, Cal., for plaintiff.

Herman Sillas, U. S. Atty., Robert Browning Miller, James S. Joiner, Asst. U. S. Attys., Sacramento, Cal., for defendant.

## OPINION

MacBRIDE, Chief Judge.

The question presently before this court is whether federal or state law provides the rule of decision governing the application of contributory or comparative negligence standards to this action under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671 *et seq.* The factual background in which the question arises can be stated briefly. On April 28, 1973, 18 DODX boxcars owned by the United States and laden with bombs being transported from Nevada to Port Chicago, California, by Southern Pacific Transportation Company (Southern Pacific) under contract with the Department of the Navy, exploded in the Antelope trainyard of Southern Pacific near Roseville, California. The explosions caused major damage to the trainyard and the surrounding area. As a result, Southern Pacific instituted this action under the Federal Tort Claims Act (FTCA) to recover, *inter alia*, for damage to the trainyard, railcars and lading in the railcars, loss of freight revenues, loss of use of Southern Pacific property and capital, and sums paid in settlement of third-party claims. All third-party suits arising from the explosions have been settled, so that the only claims remaining are the primary action by Southern Pacific for its damages and the counterclaim by the United States for loss of the boxcars and bombs.

The FTCA provides a statutory choice of law rule governing this action. Section 1346(b) provides:

the district courts . . . shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages, . . . for injury or loss of property, or personal injury or death caused by the negligent or wrong-

ful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b). As the Supreme Court held in *Richards v. United States,* 369 U.S. 1, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962), this section requires application of the whole law, including the choice of law rules, of the place where the act or omission occurred. In the usual case, the negligent act or omission and the resulting injury occur in a single state, and there is generally no dispute as to the applicable law. In this instance, however, negligent acts and omissions are alleged to have occurred in Nevada and California, and, to a significantly lesser extent, in other states, so that the selection of the state whose whole law is to apply is far more complicated. Superimposed on the selection of the applicable state law is the question whether federal law preempts some or all of the issues presented.

Section 2674 of the FTCA provides in part that the United States is to be liable "in the same manner and to the same extent as a private individual under like circumstances." If federal law were deemed to preempt state law in the context of a suit between private parties arising from an explosion in a railcar, then the argument is that federal law should also preempt otherwise applicable state law in this instance in order that the directive of the Act, that the United States be liable in the same manner and to the same extent as a private person in like circumstances, may be fulfilled.

Southern Pacific contends that federal law preempts state law in this instance because, it states:

Numerous aspects of the Roseville interstate shipment were governed by federal interstate commerce statutes and regulations. The Interstate Commerce Act reg-

ulates, inter alia, the common carrier's duty to furnish transportation and establish through routes (49 U.S.C. § 1(4)), the carrier's duty to establish just and reasonable rates (49 U.S.C. § 1(5)), the carrier's duty to make reasonable classifications of property for transportation with reference to which rates and tariffs may be prescribed (49 U.S.C. § 1(6)), the carrier's duty to furnish car service (49 U.S.C. § 1(11)), its duty to establish rules and regulations for car service (49 U.S.C. § 1(13), (14)), and the carrier's duty to refrain from discrimination in rates, interchange, and facilities (49 U.S.C. § 3). The Act prescribes the consequences of a carrier's violating regulations (49 U.S.C. § 10) and provides that the Commission is empowered to determine the lawfulness of carrier's rates and, on its own initiative, establish reasonable through routes and joint practices (49 U.S.C. § 15). The Act imposes liability on carriers for loss of freight and also prescribes limitations of liability (49 U.S.C. §§ 20(11), 101). The Act extensively regulates the form, content, terms, and conditions of bills of lading (49 U.S.C. §§ 81–124) . . . . Finally, the Act regulates safety appliances (49 U.S.C. § 26) and regulates the transportation of hazardous material (49 U.S.C. §§ 1801–1812). The regulations of the Interstate Commerce Commission and its offices regulate innumerable details of an interstate explosives shipment. The hazardous materials regulations (49 CFR §§ 102, 107, 170 *et seq.*) govern rulemaking procedures and petitions for . . . rulemaking, compliance orders and penalties, labeling, packaging, placarding, preparation of explosives for shipment, handling, loading, and inspection requirements.

Southern Pacific's brief, filed September 18, 1978, at 7–8. Certain of the statutes and regulations described, along with other federal laws and regulations, undeniably governed significant aspects of the relationship between Southern Pacific as common carrier and the United States as shipper.[1]

---

1. The United States argues that certain of the cited statutes have no application to this case.

For example, the United States rejects the citation to sections 1(5), 1(6), 3 and 15 on the

Southern Pacific contends that, since the rights and duties of the parties had a federal source, federal law must govern all phases of this litigation. The theory, briefly stated, is that the pervasive federal regulatory program governing interstate shipments preempts state law that might otherwise apply and that, therefore, federal law provides the rule of decision applicable to this case. In the absence of specific federal legislation governing an aspect of the case, Southern Pacific contends that this court must adopt a rule of federal common law. In adopting a federal rule, the court may either incorporate state law as the operative federal rule or it may adopt a uniform federal rule; in either instance, the rule would be a federal one.

Although Southern Pacific takes the general position that federal law must govern all phases of this litigation because of preemption, the briefing presented to the court is directed primarily to the single specific local rule which Southern Pacific particularly asks this court to find preempted, namely, the Nevada contributory negligence doctrine. While this court will examine the preemption arguments of the parties in the context of the entire case, the court is specifically concerned with the contributory negligence/comparative negligence issue. This decision is final only with respect to that issue. It may be that the conclusions should differ as to other issues not raised and briefed; this decision does not foreclose that possibility.

The approach taken by Southern Pacific employs the following major premises. First, the rights and duties of the parties have a federal source and are substantially related to a federal regulatory program. Second, given this federal source, the Supremacy Clause[2] and the doctrine of federal preemption require that this court apply a federal rule of decision. Next, the federal rule of decision should displace state law with a uniform federal common law rule if the state law conflicts with or frustrates federal policy. Fourth, under this guideline, Nevada's contributory negligence rule conflicts with and defeats the purposes of the federal regulatory program governing interstate shipments by rail. Fifth, the FTCA requires that the liability of the United States be determined according to federal law if a private individual's liability would be so determined. Because of the conflict between Nevada's rule and federal policy, which Southern Pacific contends is to be derived from federal railroad regulatory statutes, a private individual's liability would be determined according to federal law. Finally, Southern Pacific urges that the appropriate federal common law in this instance would be a rule of comparative negligence, the rule that prevails in California.

The United States responds to these premises with the following arguments. First, the degree of federal interest necessary to trigger federal preemption does not exist in this instance. In support, it is urged that certain of the provisions of fed-

grounds that rate making provisions are not relevant to the issues before the court and that the rates charged for the shipment of bombs had their source in section 22 of the Act. Section 10 is to be discarded, in the view of the United States, because this action is not a criminal proceeding. Moreover, the United States points out that sections 1801 to 1812 and the applicable regulations, 49 C.F.R. §§ 102, 107, were enacted or promulgated in 1975, two years after the events at issue herein, and should, therefore, have only a limited bearing, if any, on this case. It is not necessary, at this point, to determine which of the statutes and regulations cited by Southern Pacific bear on the instant litigation. It is sufficient to recognize that, as the United States admits, federal

statutes and regulations do govern certain aspects of the relationship between Southern Pacific as carrier and the United States as shipper.

2. The Supremacy Clause, Article VI, Clause 2, of the United States Constitution, declares:

This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

eral law cited by Southern Pacific as creating a federal regulatory scheme governing interstate rail shipments are (1) irrelevant to the issues before this court, (2) inapposite because they had not been enacted as of the date of the explosions, or (3) expressly intended not to preempt state law. Second, assuming *arguendo* that federal common law does govern the question of liability here because of preemption, the federal rule to be applied would be a rule of contributory negligence, and Nevada's rule is consistent with the federal scheme of regulation. Finally, the FTCA precludes the application of the federal preemption doctrine to impose a federal common law rule to this case.

Consideration of these arguments is complicated because, to a large extent, the arguments present a seamless web, each dependent upon an understanding of the others. This court will first set forth the general considerations affecting the law to be applied in the federal courts and the promulgation of a federal common law rule. After that examination, it is possible to consider the interrelation between federal common law and the FTCA and to resolve the United States' argument that the FTCA precludes the application of federal common law. Thereafter, this court will determine whether, in the circumstances of the instant action, a federal common law of tort liability should govern or whether the issue of comparative or contributory negligence should be left for resolution by state law.

**(1)** *Introductory Comments on the Law to be Applied in the Federal Courts*

The law to be applied in the federal courts varies depending on the nature of the particular case and of the specific issues in the case. There are three general categories into which that law may be subdivided: (1) state law operative of its own force, (2) state law incorporated or adopted into federal law as the federal rule of decision, and (3) federal law uniform throughout the nation. The selection of the appropriate law depends on the circumstances of each case, not on the nature of the court's juris-

diction or on other clear guidelines. For example, in the usual diversity jurisdiction case, state law will govern of its own force; the federal court sits, in effect, as another state court. This result obtains under the Supreme Court's decision in *Erie R.R. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), and the Rules of Decision Act, 28 U.S.C. § 1652, which provides:

> The laws of the several states, except where the Constitution or treaties of the United States or Acts of Congress otherwise require or provide, shall be regarded as rules of decision in civil actions in the courts of the United States, in cases where they apply.

Despite this general rule, state law will not apply of its own force in a diversity case when the particular issue is one of federal law. In such a case, the Constitution, federal statutes, federal regulations, and/or federal common law "otherwise require," and state law cannot apply of its own force. *Cf. United States v. Little Lake Misere Land Co.,* 412 U.S. 580, 593, 93 S.Ct. 2389, 2397, 37 L.Ed.2d 187, 197 (1973). The fact that federal law will govern in such instances does not necessarily indicate that the law will be a uniform federal rule throughout the nation. Instead, the federal rule of decision can derive from state law. In other words, once it has been determined that the matter is governed by federal law, there is a subsidiary question whether the content of that federal law is derived from an incorporation of state law as the federal rule of decision or is declared to be a uniform federal rule arising, for example, from a statutory or constitutional mandate.

In contrast to the diversity jurisdiction situation, the assumption in an action within the federal question jurisdiction of the district courts is that federal law will apply. As with diversity cases, this general assumption is subject to certain exceptions. For example, certain federal statutes which create a right of action have been interpreted to require that state law apply of its own force to that right of action. One such instance is 16 U.S.C. § 457, which provides:

In the case of the death of any person by the neglect or wrongful act of another within a national park or other place subject to the exclusive jurisdiction of the United States, within the exterior boundaries of any State, such right of action shall exist as though the place were under the jurisdiction of the State within whose exterior boundaries such place may be; and in any action brought to recover on account of injuries sustained in any such place the rights of the parties shall be governed by the laws of the State within the exterior boundaries of which it may be.

Thus, one court has held that this section should be construed narrowly so as to provide no reference to state law, as a matter of federal law, for deciding issues of liability, nor to contain any implication as to applicable choice of law rules.

The statute, thus construed, simply creates the right to bring a wrongful death action whenever the law of the state surrounding the enclave permits; refers to state law only to determine if the action can be brought and who has the right to bring it, and leaves the federal court to apply state law directly, *i. e.*, not as federal law, on issues of liability.

*Quadrini v. Sikorsky Aircraft Division*, 425 F.Supp. 81, 87 (D.Conn.1977). As so interpreted, section 457 creates a federal right of action in which state law governs, of its own force, on questions of liability. The United States contends, in the instant action, that the FTCA provisions have the same effect as the provisions of section 457 so that state law applies of its own force in FTCA actions. Discussion of this contention is deferred.

Federal statutes directing that state law shall apply of its own force are relatively unusual. More commonly, when state law is applied in a federal question case, the state law is deemed to have been incorporated into federal law. Under these circumstances, a federal rule of decision governs, but the content of that federal rule will derive from state law sources. An example of this situation appears in *Recon-*

*struction Finance Corp. v. County of Beaver*, 328 U.S. 204, 66 S.Ct. 992, 90 L.Ed. 1172 (1946). Congress had provided in the Reconstruction Finance Corporation Act that "any real property" of the agency "shall be subject" to taxation by the states and their political subdivisions " 'to the same extent according to its value as other real property is taxed.' " *Id.* at 206, 66 S.Ct. at 994, 90 L.Ed. at 1174. As interpreted by the Pennsylvania Supreme Court, certain machinery was subject to the state tax on real property, and the Reconstruction Finance Corporation appealed, contending that a federal definition of "real property" excluded the machinery. The Court declared:

The 1941 Act does not itself define real property. Nor do the legislative reports or other relevant data provide any single decisive piece of evidence as to Congressional intent. Obviously, it could have intended either, as the government argues, that content be given to the term "real property" as a matter of federal law, under authoritative decisions of this Court, or, as the county contends, that the meaning of the term should be its meaning under local tax laws so long as those tax laws were not designed to discriminate against the government.

. . . Congress normally intends that its laws shall operate uniformly throughout the nation so that the federal program will remain unimpaired. . . . But Congress in permitting local taxation of the real property, made it impossible to apply the law with uniform tax consequences in each state and locality. . . .

We think the Congressional purpose can best be accomplished by application of settled state rules as to what constitutes "real property" so long as it is plain, as it is here, that the state rules do not effect a discrimination against the government, or patently run counter to the terms of the Act.

*Id.* at 208, 66 S.Ct. at 995, 90 L.Ed. at 1175–76. In the Court's view, the terms of the Act evidenced congressional intent to integrate the federal permission to tax

"with established local tax assessment and collection machinery." *Id.* at 210, 66 S.Ct. at 996, 90 L.Ed. at 1176. Thus, the content of the definition of "real property" was to be found in state law as incorporated into federal law; the definition itself as so incorporated was a federal definition, presenting a federal question.

■ In still other instances, a uniform federal rule governs. As noted by the Supreme Court in the *Reconstruction Finance* case, Congress usually intends that its statutes are to be uniformly applied throughout the nation. *Id.* In such circumstances, federal law provides the rule of decision, and that rule is not dependent on or derived by incorporation of state law. Uniform federal law is not restricted to constitutional or statutory law; federal common law rules may likewise be uniform throughout the nation or, conversely, be derived by incorporation of state law and vary depending on the applicable state.

To summarize, a federal court may apply state law in a given cause or to a particular issue in a case either as operative of its own force or as incorporated into federal law, or the court may apply uniform federal law. The selection of the appropriate law is not dependent on whether the jurisdictional basis for the action is diversity or federal question jurisdiction. In either instance, the controlling principles are found in federal constitutional, statutory and common law requirements. If these requirements mandate the application of federal law, then state law operating of its own force is inapplicable. Even in such a case, however, state law may provide the rule of decision if it is appropriate to adopt or incorporate state law into the federal law as to that issue.

### (2) *Federal Common Law Origins and Developments*

■ Despite the declaration in *Erie R. R. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188, 1194 (1938), that there exists "no federal general common law," bodies of specialized federal common law are recognized and enforced by the Supreme Court and the other federal and state courts. The sources for federal common law vary with the circumstances. For example, in *Hinderlider v. La Plata River & Cherry Creek Co.,* 304 U.S. 92, 110, 58 S.Ct. 803, 811, 82 L.Ed. 1202, 1212 (1938), decided the same day as *Erie,* the Supreme Court held that "whether the water of an interstate stream must be apportioned between the two States is a question of 'federal common law' upon which neither the statutes nor the decisions of either State can be conclusive." Admiralty and maritime law is another area commonly thought of in the context of federal common law. Justification for the application of federal common law in these instances can be found, *inter alia,* in the provisions of Article III of the Constitution which extend the judicial power of the United States to controversies between two or more states and to all cases of admiralty and maritime jurisdiction. Development of federal common law is not, however, restricted to instances in which the subject matter of the dispute falls within one of the jurisdictional declarations of Article III, and this court is primarily concerned with the evolution and prerequisites for federal common law outside the mandates of Article III.

■ The watershed case from which much of the theory governing the development and application of federal common law flows is *Clearfield Trust Co. v. United States,* 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838 (1943). The *Clearfield* case presented the question whether federal or state law governed recovery on a guarantee of prior endorsements on a check drawn on the United States Treasury. The United States had brought suit for reimbursement of funds paid to Clearfield Trust Company as agent for J. C. Penney Company which had cashed the check without knowing the endorsement was forged. Clearfield Trust Company had made an express guarantee of prior endorsements when it received funds from the United States. The district court had held that the United States was barred from recovering on the guarantee because, under state law, it had unreasona-

bly delayed in giving notice of the forgery. The Supreme Court rejected state law as providing the rule of decision for the case, affirming the court of appeals decision.

We agree with the Circuit Court of Appeals that the rule of *Erie R. Co. v. Tompkins,* 304 U.S. 64 [58 S.Ct. 817], 82 L.Ed. 1188, . . . does not apply to this action. The rights and duties of the United States on commercial paper which it issues are governed by federal rather than local law. . . . The authority to issue the check had its origin in the Constitution and the statutes of the United States and was in no way dependent on the laws of Pennsylvania or of any other state. . . . The duties imposed upon the United States and the rights acquired by it as a result of the issuance find their roots in the same federal sources. . . . In absence of an applicable Act of Congress it is for the federal courts to fashion the governing rule of law according to their own standards. . . .

In our choice of the applicable federal rule we have occasionally selected state law. . . . But reasons which may make state law at times the appropriate federal rule are singularly inappropriate here. . . . The application of state law, even without the conflict of laws rules of the forum, would subject the rights and duties of the United States to exceptional uncertainty. It would lead to great diversity in results by making identical transactions subject to the vagaries of the laws of the several states. The desirability of a uniform federal rule is plain.

*Id.* at 366, 63 S.Ct. at 574, 87 L.Ed. at 841–42 (footnote omitted).[3] As defined by

subsequent decisions, the *Clearfield* doctrine can be stated as follows: (1) if the rights and duties of the parties derive sufficiently from a federal source, then federal common law may be held to govern aspects of the case on which no specific constitutional or federal statutory provision provides the rule of decision; (2) upon concluding that federal common law is to govern, the court must then determine whether that law is to be a uniform federal common law or whether the federal rule is to be incorporated from state law. The first decision may be termed the "preemption decision"[4] and the second, the "adoption decision."

The *Clearfield* doctrine did not spring full grown from the Court in 1943. Instead, it grew from the holdings and rationales of prior decisions and matured in subsequent decisions. One of the important antecedents, decided a few months earlier, is *Sola Electric Co. v. Jefferson Electric Co.,* 317 U.S. 173, 63 S.Ct. 172, 87 L.Ed. 165 (1942). *Sola Electric* was a diversity case concerning a patent licensing agreement, and the specific issue before the Court was "whether a patent licensee, by virtue of his license agreement, is estopped to challenge a price-fixing clause in the agreement by showing that the patent is invalid, and that the price restriction is accordingly unlawful because not protected by the patent monopoly." *Id.* 173, 63 S.Ct. at 172, 87 L.Ed. at 167. The question arose whether the doctrine of estoppel invoked in the lower courts was so in conflict with the federal Sherman Act's prohibition on price-fixing that federal law must govern notwithstanding contrary state estoppel law. The Court held:

It is familiar doctrine that the prohibition of a federal statute may not be set at

**3.** Although Article III specifically provides for the jurisdiction of the federal courts in "Controversies to which the United States shall be a Party," the Supreme Court in no way relied on or cited that fact in reaching its *Clearfield* decision. The framework of the decision itself and the subsequent decisions of the Supreme Court and the lower federal courts demonstrate that the Court did not ground its decision on the Article III grant of jurisdiction. See also Mishkin, The Variousness of "Federal Law": Competence and Discretion in the Choice of Nation-

al and State Rules for Decision, 105 U.Pa.L. Rev. 797, 801 n. 19 (1957).

**4.** As the parties recognize, the term "preemption" has been employed in many contexts so that the concept of preemption is not unitary but multi-faceted. For purposes of this decision, the term is used to describe the conclusion that a particular issue must be governed by federal law rather than state law operative of its own force.

naught, or its benefits denied, by state statutes or state common law rules. In such a case our decision is not controlled by *Erie R. Co. v. Tompkins.* . . . There we followed state law because it was the law to be applied in the federal courts. But the doctrine of that case is inapplicable to those areas of judicial decision within which the policy of the law is so dominated by the sweep of federal statutes that legal relations which they affect must be deemed governed by federal law having its source in those statutes, rather than by local law. . . . When a federal statute condemns an act as unlawful the extent and nature of the legal consequences of the condemnation, though left by the statute to judicial determination, are nevertheless federal questions, the answers to which are to be derived from the statute and the federal policy which it has adopted. To the federal statute and policy, conflicting state law and policy must yield.

*Id.* at 176, 63 S.Ct. at 173, 87 L.Ed. at 168. The cases on which the *Sola Electric* Court relied reappear as the precedent for the decision in *Clearfield. E. g., Royal Indemnity Co. v. United States,* 313 U.S. 289, 61 S.Ct. 995, 85 L.Ed. 1361 (1941); *Deitrick v. Greaney,* 309 U.S. 190, 60 S.Ct. 480, 84 L.Ed. 694 (1940); *Jackson County v. United States,* 308 U.S. 343, 60 S.Ct. 285, 84 L.Ed. 313 (1939). *Sola Electric* is particularly significant because it concerned a purely private dispute in the federal courts solely on the basis of diversity.

The Supreme Court fleshed out the *Clearfield* doctrine in a series of subsequent cases. In *Bank of America National Trust & Savings Ass'n v. Parnell,* 352 U.S. 29, 77 S.Ct. 119, 1 L.Ed.2d 93 (1956), the bank sued in diversity alleging that the defendants had converted certain bearer bonds on which payment was guaranteed by the United States. The principal issue at trial was whether the defendants had taken the bonds in good faith without knowledge of the defect in their title, and the question before the Supreme Court was whether state law governed the definition of conversion of the bonds. The Court declared that

the rationale of the *Clearfield* decision was inapplicable:

> The present litigation is purely between private parties and does not touch the rights and duties of the United States. The only possible interest of the United States in a situation like the one here, exclusively involving the transfer of Government paper between private persons, is that the floating of securities of the United States might somehow or other be adversely affected by the local rule of a particular State regarding the liability of a converter. This is far too speculative, far too remote a possibility to justify the application of federal law to transactions essentially of local concern.

*Id.* at 33, 77 S.Ct. at 121, 1 L.Ed.2d at 96–97. The Court qualified its decision to make clear its conclusion that, although generally inapplicable in the *Parnell* circumstances, federal common law might govern in other cases involving only private litigants and that, even in *Parnell,* federal common law would govern specific issues:

> We do not mean to imply that litigation with respect to Government paper necessarily precludes the presence of a federal interest, to be governed by federal law, in all situations merely because it is a suit between private parties, or that it is beyond the range of federal legislation to deal comprehensively with Government paper. We do not of course foreclose such judicial or legislative action in appropriate situations by concluding that this controversy over burden of proof and good faith represents too essentially a private transaction not to be dealt with by the local law . . . . Federal law of course governs the interpretation of the nature of the rights and obligations created by the Government bonds themselves. A decision with respect to the "overdueness" of the bonds is therefore a matter of federal law.

*Id.* at 34, 77 S.Ct. at 121, 1 L.Ed.2d at 97.

The next case in the line of decisions is *Wallis v. Pan American Petroleum Corp.,* 384 U.S. 63, 86 S.Ct. 1301, 16 L.Ed.2d 369

(1966), in which the question before the Court was whether federal or state law should, as a general matter, govern the dealings of private parties in oil and gas leases validly issued under the Mineral Leasing Act of 1920. In that case, Wallis had obtained a lease under the Act; one McKenna sued in diversity to be declared a one-third owner of the lease under a prior agreement with Wallis, and Pan American sued McKenna in diversity to force him to honor an option agreement whereby Pan American was to acquire McKenna's interest in the lease. The cases were consolidated, tried, and ultimately appealed to the Supreme Court. The Court declared:

> In deciding whether rules of federal common law should be fashioned, normally the guiding principle is that a significant conflict between some federal policy or interest and the use of state law in the premises must first be specifically shown. It is by no means enough that, as we may assume, Congress could under the Constitution readily enact a complete code of law governing transactions in federal mineral leases among private parties. Whether latent federal power should be exercised to displace state law is primarily a decision for Congress. Even where there is related federal legislation in an area, as is true in this instance, it must be remembered that "Congress acts . . . against the background of the total corpus juris of the states. . . ." Hart & Wechsler, The Federal Courts and the Federal System 435 (1953). Because we find no significant threat to any identifiable federal policy or interest, we do not press on to consider other questions relevant to invoking federal common law, such as the strength of the state interest in having its own rules govern, . . . the feasibility of creating a judicial substitute, . . . and other similar factors.

> If there is a federal statute dealing with the general subject, it is a prime repository of federal policy and a starting point for federal common law. . . . [One section of the 1920 Act] provides that oil and gas leases shall be assignable. The Court of Appeals' opinion relied on this provision, together with reasons why assignment of leases may promote federal policy, in justifying the use of federal rather than state law. However, fitting this approach may be where a State interposes unreasonable conditions on assignability, it can have no force in this instance because Louisiana concededly provides a quite feasible route for transferring any mineral lease . . . .

> . . . [It is argued that] there is a federal interest in having private disputes over [federal leases] justly resolved. Apart from the highly abstract nature of this interest, there has been no showing that state law is not adequate to achieve it.

*Id.* at 68, 86 S.Ct. at 1304, 16 L.Ed.2d at 373–74 (footnote omitted). For the reasons stated, the Court held that "federal law should not govern the present controversy." *Id.* at 72, 86 S.Ct. at 1306, 16 L.Ed.2d at 374.[5] Both *Parnell* and *Wallis* arose from and were factually confined to disputes between private parties. Although the Supreme Court held under the facts of those cases that state law should govern, the Court specifically indicated in both decisions that it did not limit the development of federal common law to cases involving the United States as a party.

It is helpful at this point to consider a larger portion of the discussion quoted by the Court from Hart & Wechsler's commentary on the federal courts:

> Federal law is generally interstitial in nature. It rarely occupies a legal field

---

**5.** The Supreme Court's language is equivocal as to whether state law was to govern of its own force or whether, under the circumstances of the case, the governing federal law was to be found in state law as incorporated to be the federal rule of decision. The decision itself would seem to indicate the former, but subsequent decisions by the Court indicate the latter.

*E. g., United States v. Little Lake Misere Land Co.*, 412 U.S. 580, 603, 93 S.Ct. 2389, 2402, 37 L.Ed.2d 187, 203 (1973) (citing *Wallis* as an instance in which it was appropriate to select state law). It is not necessary to resolve this question to determine the issues before this court.

completely, totally excluding all participation by the legal systems of the states. This was plainly true in the beginning when the federal legislative product (including the Constitution) was extremely small. It is significantly true today, despite the volume of Congressional enactments, and even within areas where Congress has been very active. Federal legislation, on the whole, has been conceived and drafted on an *ad hoc* basis to accomplish limited objectives. It builds upon legal relationships established by the states, altering or supplanting them only so far as necessary for the special purpose. Congress acts, in short, against the background of the total *corpus juris* of the states in much the way that a state legislature acts against the background of the common law, assumed to govern unless changed by legislation.

. . . .

The point is vital to appreciation of the legal issues . . . concerned with the relationship between the law of the United States and of the states. It explains why frequently in litigation federal law bears only partially upon the case: the basis of a right asserted by the plaintiff which is open to defenses grounded in state law, the basis of a defense when a state-created right has been advanced, the foundation of a replication to a state defense or only of the rejoinder to a replication that would otherwise be good. It explains why federal law often embodies concepts that derive their content, or some portion of their content, from the states. It makes it less anomalous, at least, that substantive rights may be defined by Congress but the remedies for their enforcement left undefined or relegated wholly to the states; or that *per contra* national law may do no more than formulate remedies for vindicating rights that have their source and definition in state law.

P. Bator, P. Mishkin, D. Shapiro & H. Wechsler, Hart & Wechsler's The Federal Courts and The Federal System 470–471 (2d Ed. 1973).

Consciousness of the interstitial nature of federal law is reflected in the 1973 decision of *United States v. Little Lake Misere Land Co.*, 412 U.S. 580, 93 S.Ct. 2389, 37 L.Ed.2d 187 (1973), which concerned a land dispute under the Migratory Bird Conservation Act. The United States had acquired land in Louisiana under that Act subject to reserved mineral rights in the former owners for 10 years. The reservation of rights could be extended if certain conditions were met. Although the stated conditions had not been met, the former owners contended that they retained the mineral rights under a Louisiana statute which applied retroactively to extend mineral rights reserved in land conveyances to the United States. The United States sued to quiet title, and the question before the Supreme Court was "whether state law may retroactively abrogate the terms of written agreements made by the United States when it acquires land for public purposes explicitly authorized by Congress." *Id.* at 582, 93 S.Ct. at 2391, 37 L.Ed.2d at 191. The essential premise of the Fifth Circuit's decision was that state law governed the interpretation of the agreement. The Supreme Court rejected the suggestion that *Erie R. R. v. Tompkins, supra,* and the Rules of Decision Act, 28 U.S.C. § 1652, compelled the application of state law in the absence of an explicit congressional command to the contrary. *United States v. Little Lake Misere Land Co., supra* at 590, 93 S.Ct. at 2396, 37 L.Ed.2d at 196. The Court declared:

The federal jurisdictional grant over suits brought by the United States is not in itself a mandate for applying federal law in all circumstances. This principle follows from Erie itself, where, although the federal courts had jurisdiction over diversity cases, we held that the federal courts did not possess the power to develop a concomitant body of federal law.

. . .

[Nonetheless, this land acquisition] is one arising from and bearing heavily upon a federal regulatory program. Here, the choice-of-law task is a federal task for federal courts, as defined by *Clearfield Trust Co. v. United States.*

. . . . Since Erie, and as a corollary of that decision, we have consistently acted on the assumption that dealings which may be "ordinary" or "local" as between private citizens raise serious questions of national sovereignty when they arise in the context of a specific constitutional or statutory provision; particularly is this so when transactions undertaken by the Federal Government are involved, as in this case. In such cases, the Constitution or Acts of Congress "require" otherwise than that state law govern of its own force.

*Id.* at 591, 93 S.Ct. at 2396, 37 L.Ed.2d at 196–97 (footnote omitted). The Court noted that, often, there will be no specific federal legislation governing the particular transaction; this absence of specific statutory provisions is, however, "no reason for limiting the reach of federal law." *Id.* at 593, 93 S.Ct. at 2397, 37 L.Ed.2d at 197. Instead,

. the inevitable incompleteness presented by all legislation means that interstitial federal lawmaking is a basic responsibility of the federal courts. "At the very least, effective Constitutionalism requires recognition of power in the federal courts to declare, as a matter of common law or 'judicial legislation,' rules which may be necessary to fill in interstitially or otherwise effectuate the statutory patterns enacted in the large by Congress. In other words, it must mean recognition of federal judicial competence to declare the governing law in an area comprising issues substantially related to an established program of governmental operation."

*Id.* at 593, 93 S.Ct. at 2397, 37 L.Ed.2d at 197, *quoting* Mishkin, The Variousness of "Federal Law": Competence and Discretion in the Choice of National and State Rules for Decision, 105 U.Pa.L.Rev. 797, 800 (1957).

The Court described this conclusion respecting the power of the federal courts to declare the governing law as the first step of the *Clearfield* analysis. The second step of that analysis is to determine whether the governing federal common law is to be derived from "borrowed" or incorporated state law or is to be a uniform rule of federal law not dependent on the body of state statutory and common law. This second step requires a consideration of federal policy, the "'groundings of the action,'" the legal interests and relations of the federal government, and "'a variety of considerations always relevant to the nature of the specific governmental interests and to the effect upon them of applying state law.'" *Id.* at 595, 93 S.Ct. at 2398, 37 L.Ed.2d at 198, *quoting United States v. Standard Oil Co.,* 332 U.S. 301, 310, 67 S.Ct. 1604, 1609, 91 L.Ed. 2067, 2073 (1947). The *Standard Oil* decision included in the variety of relevant considerations both "federal supremacy in the performance of federal functions" and "the need for uniformity," as well as "inferences properly to be drawn from the fact that Congress, though cognizant of the particular problem, has taken no action to change long-settled ways of handling it." *Id.* at 310, 67 S.Ct. at 1609, 91 L.Ed. at 2073. Under the circumstances presented in *Little Lake Misere,* the Supreme Court held that it would be inappropriate to incorporate the Louisiana statute as the governing federal law. On the other hand, the Court declined to follow the suggestion, offered "virtually without qualification, that land acquisition agreements of the United States should be governed by federally created federal law." *United States v. Little Lake Misere Land Co., supra* 412 U.S. at 595, 93 S.Ct. at 2398, 37 L.Ed.2d at 198. This broad approach was unnecessary in the Court's view because, even if "the established body of state property law should generally govern federal land acquisitions," it was clear that the particular Louisiana statute should not be adopted as the federal rule of decision. That statute was deemed "plainly hostile to the interests of the United States" and "plainly not in accord with the federal program." *Id.* at 604, 93 S.Ct. at 2403, 37 L.Ed.2d at 199, 203.

The *Standard Oil* case, referred to by *Little Lake Misere,* is of particular interest because it concerns the application of the *Clearfield* doctrine in a tort context. In

that case, a soldier was injured in an accident with a Standard Oil Company truck; the soldier's hospital expenses were covered by the federal government and his pay was continued during the resulting disability. The soldier released Standard Oil Company in a settlement, but the United States sued the company to recover the amounts expended for hospitalization and soldier's pay, based on an indemnity theory and on the company's asserted independent liability to the United States for the deprivation of the soldier's services. The issues before the Supreme Court were the question of the company's liability and the question whether that liability should be determined by state or federal law. The Court held that the existence of liability was clearly governed by federal law under the *Clearfield* doctrine, finding the principles of that case "equally applicable" to federal relations that were noncontractual or tortious in nature. This holding grew from the conclusion that "[p]erhaps no relation between the Government and a citizen is more distinctly federal in character than that between it and members of its armed forces." For that reason, "the scope, nature, legal incidents and consequences of the relation between persons in service and the Government are fundamentally derived from federal sources and governed by federal authority." *Id.* 332 U.S. at 305, 67 S.Ct. at 1607, 91 L.Ed. at 2070–71. The Court declared:

> As in the *Clearfield* case, moreover, quite apart from any positive action by Congress, the matter in issue is neither primarily one of state interest nor exclusively for determination by state law within the spirit and purpose of the *Erie* decision. . . .
>
> . . . [T]he *Erie* decision . . . had no effect, and was intended to have none, to bring within the governance of state law matters exclusively federal, because made so by constitutional or valid congressional command, or others so vitally affecting interests, powers and relations of the Federal Government as to require uniform national disposition rather than diversified state rulings. Cf.

*Clearfield Trust Co. v. United States* . . . . Hence, although federal judicial power to deal with common-law problems was cut down in the realm of liability or its absence governable by state law, that power remained unimpaired for dealing independently, wherever necessary or appropriate, with essentially federal matters, even though Congress has not acted affirmatively about the specific question.

> In this sense therefore there remains what may be termed, for want of a better label, an area of "federal common law" or perhaps more accurately "law of independent federal judicial decision," outside the constitutional realm, untouched by the *Erie* decision.

*Id.* at 307, 67 S.Ct. at 1607, 91 L.Ed. at 2071–72. Having rejected the application of state law of its own force, the Court next concluded that it was inappropriate to promulgate a federal rule, either one derived by incorporation of state law or one of universal applicability. The United States had argued strongly for the creation of a uniform federal rule:

> Growth, it urges, is the life of the law as it is of all living things. And in this expansive and creative living process, we are further reminded, the judicial institution has had and must continue to have a large and pliant, if also a restrained and steady, hand. Moreover, the special problem here has roots in the ancient soil of tort law, wherein the chief plowman has been the judge, notwithstanding his furrow may be covered up or widened by legislation.

*Id.* at 311, 67 S.Ct. at 1610, 91 L.Ed. at 2073–74. Despite the law's capacity for creative growth and the fact that "the judicial hand would stiffen in mortmain if it had no part in the work of creation," the Court concluded that the development of a federal law as sought by the United States was "a proper subject for congressional action, not for any creative power of ours." *Id.* at 314, 67 S.Ct. at 1611, 91 L.Ed. at 2075. Accordingly, the Court affirmed the circuit court's decision reversing the trial court's judgment for the United States.

The most recent Supreme Court decision drawing from *Clearfield* is *Miree v. DeKalb County,* 433 U.S. 25, 97 S.Ct. 2490, 53 L.Ed.2d 557 (1977). After an airplane crash following takeoff from the DeKalb-Peachtree Airport, lawsuits were instituted to recover for injury and death against the county, under diversity jurisdiction, and the United States, under the FTCA. The cases were consolidated, and the district court granted the county's motion to dismiss; that decision was appealed to the Supreme Court. The question on appeal arose from a contract between the county and the Federal Aviation Administration (FAA) whereby the county was to restrict the use of land near the airport to those activities compatible with airport operations. The plaintiffs sought to impose liability on the county as third-party beneficiaries of the contract on the theory that the county's breach of the contract, by maintaining a garbage dump on the land which attracted birds that were ingested into the plane's engines, caused the crash. The Supreme Court stated that, since the only basis of jurisdiction over the county was diversity, "the case would unquestionably be governed by Georgia law" under *Erie* "but for the fact that the United States is a party to the contract in question, entered into pursuant to federal statute." *Id.* at 28, 97 S.Ct. at 2493, 53 L.Ed.2d at 562. The Fifth Circuit had held that application of federal common law was mandated for that reason, but the Supreme Court rejected that conclusion. The Court declared:

> The litigation before us raises no question regarding the liability of the United States or the responsibility of the United States under the contract. The relevant inquiry is a narrow one: whether petitioners as third-party beneficiaries to the contract have standing to sue respondent. While federal common law may govern even in diversity cases where a uniform national rule is necessary to further the interests of the Federal Government, *Clearfield Trust Co. v. United States,* . . . the application of federal common law to resolve the issue presented here would promote no federal interests even approaching the magnitude of those found in *Clearfield Trust* . . . . The operations of the United States in connection with FAA grants such as these are undoubtedly of considerable magnitude. However, we see no reason for concluding that these operations would be burdened or subjected to uncertainty by variant state-law interpretations regarding whether those with whom the United States contracts might be sued by third-party beneficiaries.

*Id.* at 28, 97 S.Ct. at 2493, 53 L.Ed.2d at 562–63 (footnote omitted). The Court deemed the substantial interests of the United States in regulating air travel and air travel safety insufficient "to call into play the rule of Clearfield Trust" given the narrow issue before the Court. The Court adhered to the language in *Wallis,* quoted above, that the decision whether to displace state law is primarily for Congress, adding that Congress had chosen not to do so in this case. In a footnote, the Court commented that Congress had considered but not enacted a bill to provide a federal right of action for injuries arising from aircraft disasters. *Id.* at 32 & n. 5, 97 S.Ct. at 2495 & n. 5, 53 L.Ed.2d at 565 & n. 5. For these reasons, the Court held that the federal interest at stake was too remote to justify application of federal law. Chief Justice Burger concurred in the Court's decision with a separate opinion in which he stated his belief that the application of federal common law should not be limited to those instances in which the rights and obligations of the federal government are at stake, despite language in the majority opinion that "might be misinterpreted" to so indicate. *Id.* at 34, 97 S.Ct. at 2496, 53 L.Ed.2d at 566.

*Clearfield* and the other Supreme Court decisions included in the development of the *Clearfield* doctrine have been discussed and interpreted at length by the lower federal courts. A comprehensive examination of these many cases would require a treatise, but two are of particular note. The first is *United States v. Carson,* 372 F.2d 429 (6th Cir. 1967), an action for conversion arising

from a federal loan under the Bankhead-Jones Farmer Tenant Act, in which the court summarized the principles of the *Clearfield* doctrine:

> *Clearfield* and the cases cited therein emphasize that the federal courts should determine the governing rule or law "according to their own standards" in areas where constitutionally valid federal legislative programs have been commenced. Where a decision is likely to have a substantial effect on the implementation of a federal program, then a federal court should declare a rule consistent with the program's demands. Congress, of course, is the primary source of federal law, and the federal courts must adhere to the intent of Congress whenever this intent is discernible. . . . [E]ven in situations where the federal courts are not bound by the constitutional principles underlying *Erie* to apply state law, they might refrain from enunciating a federal rule applicable throughout the nation. The presence of a federal program permits the federal courts to make a choice, but does not of itself determine what the choice will be.

*Id.* at 432. In *United States v. Sommerville,* 324 F.2d 712 (3d Cir. 1963), *cert. denied,* 376 U.S. 909, 84 S.Ct. 663, 11 L.Ed.2d 608 (1964), also a conversion case, the court declared:

> An independent federal rule of decision must be applied when a genuine federal interest would be subjected to uncertainty by application of disparate state rules.[8]
>
> [8] Two separate inquiries must be made. The first is to ascertain if the requisite federal interest is present. If there is, a federal rule may be formulated. The necessity of uniformity must decide whether state law should be rejected as the source for the applicable federal rule.

Genuine federal interests have been found to be present when federal elements such as statutes, regulations and executive orders exist in the pertinent field. The reasoning underlying the *Clearfield* decision has been used to support the application of federal law to suits in which there were federal interests regardless of whether the United States was or was not a party, or whether diversity of citizenship or a federal question served as the jurisdictional basis for the action.

. . . .

*Id.* at 714–15 (other footnotes omitted).

Certain conclusions may be drawn from these cases and their progeny. First, if the particular question is one that arises from and bears heavily upon a federal regulatory program, then the *Clearfield* doctrine will require the court to apply federal law to that question. This is the preemption decision. The decision that federal law must apply looks to whether the rights and duties of the United States are at stake or whether the interests of the United States are directly affected. The preemption decision is primarily one for Congress, not the courts, but circumstances may exist in which the court must conclude that preemption is required. Second, although not conclusive, the fact that the United States is a party to the suit in general and an interested party as to the particular issue facilitates the conclusion that preemption is appropriate. Nonetheless, preemption may be proper in suits wholly between private parties and, conversely, may be improper in suits to which the United States is a party. Third, if the court concludes that preemption is not warranted, then the matter is ended. If, however, it is determined that federal law should preempt on the particular issue before the court, then the court must reach the second step of the *Clearfield* analysis, that is, the adoption decision. This decision looks to whether the federal interests can best be effectuated by the adoption of a uniform federal rule or by the adoption or incorporation of state law as the federal rule of decision. State laws that directly conflict with the purposes of the federal regulatory program are inappropriate for adoption, and a court faced with a conflicting state law would adopt a federal rule.

### (3) Interrelation between Federal Common Law and the FTCA

Having set forth the nature of the law applied in the federal courts and the *Clear-*

*field* doctrine, this court must now examine the specific issues presented by the parties. There are two major questions for decision: (1) does the federal law preempt state standards of negligence because of the pervasive federal regulation of railroad transportation, and (2) does the FTCA preclude the application of such a preemptive federal law in actions brought under that Act's provisions. Although the parties intermingle the two questions to a certain extent, it is essential that they be kept separate. The first goes to the merits of the negligence standard to be applied, while the second sets up a barrier to the application of a federal negligence standard. This court will now consider the United States' argument that the FTCA precludes the application of a preemptive federal law.

Southern Pacific contends that the federal regulatory program governing interstate commerce in general and rail transportation in particular is such that the genuine federal interests at stake mandate the application of federal common law to, *inter alia,* questions of liability. Because no choice of law decision has yet been made in this action, Southern Pacific offers alternative approaches based on the circumstances presented by the law of the two states whose internal law is most likely to govern. It is urged that, if the ultimate choice of law decision points to the application of the internal law of California, then this court should adopt or incorporate California's comparative negligence standard into federal common law as the federal rule of decision. On the other hand, if the choice of law decision points to the application of Nevada's internal law, then Southern Pacific contends that Nevada's contributory negligence scheme must be rejected as inconsistent with the purposes of the federal regulatory program[6] and a federal rule of comparative negligence promulgated instead. These alternatives come into play

only on the assumption that federal law does preempt; in other words, the discussion concerning the adoption of California's comparative negligence standard and the rejection of Nevada's contributory negligence standard assumes that the court will reach the second part of the *Clearfield* analysis, the adoption decision.

The United States would truncate the analysis at its initiation on the ground that the FTCA mandates the application of state law operative of its own force and, accordingly, that there is no room for the application of federal common law under the *Clearfield* doctrine. Based on the premise that the FTCA requires the application of state law operative of its own force, the United States contends that one of the alternatives urged by Southern Pacific—the incorporation of California's comparative negligence standard as the federal rule of decision—is violative of the mandates of the FTCA.

The distinction between state law operative of its own force and state law incorporated into federal common law is largely academic in the usual case. The distinction becomes relevant for purposes of appeal to the Supreme Court because state law incorporated into federal law presents a federal question reviewable in that Court whereas state law operative of its own force presents no federal question. *See* P. Bator, P. Mishkin, D. Shapiro & H. Wechsler, Hart & Wechsler's The Federal Courts and the Federal System 439–573 (2d Ed. 1973). In addition, the distinction has been deemed relevant in determining whether the state or the federal conflicts of law rule should govern in a particular case. *E. g., Quadrini v. Sikorsky Aircraft Division,* 425 F.Supp. 81 (D.Conn.1977).

In this case, the United States has seized on the distinction between state law operative of its own force and state law incorporated into federal law and urges

---

**6.** In support of the argument that only a comparative negligence standard is consistent with the federal regulatory scheme, Southern Pacific contends that comparative fault standards encourage compliance with federal safety requirements, that only comparative fault standards are compatible with the Carmack Amendment and the Uniform Bill of Lading Act provisions that a carrier shall not be liable for the shipper's negligence, and that a rule of comparative negligence promotes the policy of uniformity throughout the nation.

that difference as the basis for precluding the application of the *Clearfield* doctrine to this case. As will be discussed, the initial premise urged by the United States—that the FTCA requires the application of state law operative of its own force—is erroneous; instead, the Act provides for the application of state law incorporated into federal law as the federal rule of decision. Because of that initial erroneous premise, the United States fails to focus on the very pertinent question of whether the FTCA requires the application of state law, as incorporated into federal law, despite the existence of a preemptive federal law. The question before this court turns on whether the FTCA requires the application of *state* law or whether the FTCA requires the application of the law that a state court would be required to apply to an action between private parties under like circumstances.

This court will, first, address the United States' contention that the FTCA mandates the application of state law operative of its own force. Thereafter, the court will consider the requirements of the FTCA as to the law that must be applied.

(a) *Does State Law Operative of Its Own Force Govern?* The United States' argument that the FTCA requires the application of state law operative of its own force is based on the Supreme Court's decision in *Richards v. United States,* 369 U.S. 1, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962). The question to be decided in that case was "what law a Federal District Court should apply in an action brought under the Federal Tort Claims Act where an act of negligence occurs in one State and results in an injury and death in another State." *Id.* at 2, 82 S.Ct. at 587, 7 L.Ed.2d at 494 (footnote omitted). The choices discussed by the Court were:

(1) the internal law of the place where the negligence occurred, or (2) the whole law (including choice-of-law rules) of the place where the negligence occurred, or (3) the internal law of the place where the operative effect of the negligence took place.

*Id.* The Court read the language in section 1346(b) of the Act providing a right of action for injuries

caused by the negligent or wrongful act or omission of any employee of the Government . . . under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred

as requiring reference to the second alternative: the whole law of the place where the negligent act occurred. In reaching that conclusion, the Court employed phraseology that, in the United States' view, demonstrates that the Act mandates the application of state law operative of its own force. This language is as follows:

The Tort Claims Act was designed . . . to render the Government liable in tort as a private individual would be under like circumstances. It is evident that the Act was not patterned to operate with complete independence from the principles of law developed in the common law and refined by statute and judicial decision in the various States. Rather, it was designed to build upon the legal relationships formulated and characterized by the States, and, to that extent, the statutory scheme is exemplary of the generally interstitial character of federal law. If Congress had meant to alter or supplant the legal relationships developed by the States, it could specifically have done so to further the limited objectives of the Tort Claims Act. That is, notwithstanding the generally interstitial character of the law, Congress, in waiving the immunity of the Government . . . ., could have imposed restrictions and conditions on the extent and substance of its liability. We must determine whether, and to what extent, Congress exercised this power in selecting a rule for the choice of laws to be applied in suits brought under the Act. And, because the issue of the applicable law is controlled by a formal expression of the will of Congress, we need not pause to consider the question whether the conflict-of-laws rule applied

in suits where federal jurisdiction rests upon diversity of citizenship shall be extended to a case such as this, in which jurisdiction is based upon a federal statute. In addition, and even though Congress has left to judicial implication the task of giving content to its will in selecting the controlling law, because of the formal expression found in the Act itself, we are presented with a situation wholly distinguishable from those cases in which our initial inquiry has been whether the appropriate rule should be the simple adoption of state law.

*Id.* at 6, 82 S.Ct. at 589, 7 L.Ed.2d at 496–97 (footnotes omitted). In footnote 14, the Court cited, *inter alia,* to Clearfield. The United States contends that "*Richards* stands for the proposition that the law of the state is to be applied of its *own force,* without regard to the *Clearfield Trust* situation wherein state law is adopted as a federal rule but is *inapplicable* of its own force." United States' Brief, filed Oct. 4, 1978, at 56. Moreover, the United States urges:

The [*Richards*] court thus conclusively established that Congress' intent in enacting FTCA was that the *tort law of the state where the negligence occurred* was to govern the liability of the government as a private party under FTCA. The indisputable corollary to this conclusion is that if a private party would not be liable in negligence under the tort law of the state, that no liability would flow. The tort law of the state under the FTCA thus applies *of its own force,* contrary to the usage of state law in the *Clearfield Trust* context where state law provides no independent source of private rights. . . . It should also be noted that the court in *Richards* did not discuss whether an exception to FTCA exists where a state court is compelled to adopt federal

common law under *Clearfield Trust.* Indeed, . . . the court in *Richards* expressly dismissed *Clearfield* as having any bearing on an FTCA action.

*Id.* at 57.

This reading of the FTCA and of *Richards* is incorrect, as an initial matter, because the *Richards* Court did not declare that state law must apply of its own force and because, as will be discussed, other courts have held that the Act requires the application of state law as incorporated into federal law, *not* as operative of its own force. The question of state law operative of its own force as opposed to state law as incorporated into federal law was not presented to the *Richards* Court. The only choice of law questions before the Supreme Court were whether the Act's language pointed to the whole law or the internal law of the place where the act or omission occurred or the place where the negligence had its effect. The Court's comment which the United States reads as expressly dismissing the applicability of the *Clearfield* doctrine to an FTCA action merely distinguishes (1) the second step of the *Clearfield* analysis in which, having concluded that federal law is to govern, a court must decide whether the federal interests can best be effected by incorporation of state law or by promulgation of a federal rule from (2) the FTCA situation in which Congress has expressed its intention that the operative law of the place where the negligent act or omission occurred is to be incorporated as the federal rule of decision.[7] In virtually all instances, as was the case in *Richards,* the law to be applied will be state law, but the *Richards* Court did not distinguish between state law operative of its own force and state law incorporated into federal law. Nor did the Court discuss the interrelationship between the FTCA and the federal

7. This interpretation of the Supreme Court's citation to *Clearfield* in *Richards* is supported by an analogous citation to *Clearfield* in *Moor v. County of Alameda,* 411 U.S. 693, 701, 93 S.Ct. 1785, 1791, 36 L.Ed.2d 596, 605 & n. 12 (1973), in the context of 42 U.S.C. § 1988 which authorizes the federal courts to look to state law principles to fill the interstices of federal

civil rights remedies. The *Moor* Court noted that the case before it was wholly unlike those in which, "lacking any clear expression of congressional will, we have been called upon to decide whether it is appropriate to look to state law or to fashion a single federal rule in order to fill the interstices of federal law," and cited *Clearfield* and certain other cases.

common law under the *Clearfield* doctrine. Not having discussed the question, the *Richards* decision cannot be cited as having decided it.

Although the distinction between state law operative of its own force and state law as incorporated into federal law was not discussed or decided in *Richards,* that distinction has been considered by other courts, all of which reject the United States' contention that the FTCA requires the application of state law operative of its own force. The most significant of these is *Feres v. United States,* 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950). In *Feres,* the Court declared that the language in section 1346(b) of the FTCA "makes ' . . . the law of the place where the act or omission occurred' govern any consequent liability. . . . This provision recognizes and *assimilates into federal law* the rules of substantive law of the several states . . . ." *Id.* at 142, 71 S.Ct. at 157, 95 L.Ed. at 159 (emphasis added). That statement that the FTCA assimilates state law into federal law is directly contrary to the position urged by the United States that the applicable law is state law operative of its own force. No assimilation or incorporation of state law occurs when state law is operative of its own force. Similarly, in *Quadrini v. Sikorsky Aircraft Division, supra,* the court declared that the FTCA "plainly applies state law, *as a matter of federal law,* to issues of liability by providing that the 'liability' of the government to the claimant shall be 'in accordance with' the law of the state of the tort." *Id.* at 86 (emphasis added). Finally, in *Moor v. County of Alameda,* 411 U.S. 693, 93 S.Ct. 1785, 36 L.Ed.2d 596 (1973), the Supreme Court commented that it is "not uncommon for Congress to direct that state law be used to fill the interstices of federal law." In a footnote, the Court added: "A ready example of such federal *adoption* of state law is to be found in the Federal Tort Claims Act . . . ." *Id.* at 701, 93 S.Ct. at 1791, 36 L.Ed.2d at 605 & n. 11 (emphasis added).

The United States' argument that the FTCA requires the application of state law operative of its own force is thus wholly without merit. The real question is whether the Act requires the application of *state* law as incorporated into federal law to the derogation of any otherwise applicable federal preemptive common law. This court will now turn to that question.

(b) *Can Federal Common Law Ever Govern Under the FTCA?* The distinction that should be drawn in determining the effect of the FTCA's reference to the law of the place is not between state law operative of its own force and state law incorporated into federal law; instead, the pertinent distinction is between the state law that the FTCA incorporates into that federal statute and all other forms of federal law, including federal common law under the *Clearfield* doctrine.

No court decisions are directly on point to assist in the resolution of this question, although various decisions are pertinent. Before discussing those decisions, however, it is helpful to consider a hypothetical. Let us assume, *arguendo,* that the Supreme Court was presented in 1972 with a rail carrier's suit against a private manufacturer and shipper of fireworks for injuries sustained as a result of an explosion of those fireworks and that the Court had ruled that the federal regulatory program governing interstate shipments of hazardous materials and interstate rail transportation was implicated in the private suit to such an extent that protection of the federal interests in that regulatory program could be achieved only by the adoption of a federal common law rule of liability which rule would preempt all state laws otherwise applicable. If, under that federal common law rule, the private manufacturer and shipper of fireworks would be liable for damages, then it could not reasonably be argued that the United States should escape liability under identical factual circumstances, substituting bombs for fireworks, solely because the source of that liability is federal law rather than state law. The United States so argues in this case, contending that its liability under the FTCA can be founded only in state law. Yet any such result would contravene the mandate

of the FTCA that the United States is to be liable "in the same manner and to the same extent as a private individual under like circumstances," 28 U.S.C. § 2674, and that the liability shall arise "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." *Id.* § 1346(b). The Act itself refers, not to the law of the *state*, but to the law of the place; in other words, the Act makes reference to the law that would be applied in the place where the negligent act or omission occurred. In the vast majority of FTCA cases, that law will, in fact, be the law of that state, but the language of the Act does not mandate that state law be applied when the state courts themselves would be required to refer to and apply federal law to determine the liability of a private person.

Turning to the cases under the FTCA, certain decisions involving maritime torts are relevant here. The most significant of these is *Hess v. United States*, 361 U.S. 314, 80 S.Ct. 341, 4 L.Ed.2d 305 (1960), an FTCA action to recover damages for the death of a person working on repairs to the Bonneville Dam in Oregon. The Court declared:

> Graham's death and the wrongful act or omission which allegedly caused it occurred within the State of Oregon, and liability must therefore be determined in accordance with the law of that place. Since death occurred on navigable waters, the controversy is, as the trial court correctly held, within the reach of admiralty jurisdiction . . . . Oregon would be required, therefore, to look to maritime law in deciding [the controversy]. . . .[7]

[7] The petitioner argues that "the place where the act or omission occurred" was on the dam itself, an extension of the land, and that, therefore, this case should be decided in accordance with the law that Oregon would apply to torts occurring on land. It is clear, however, that the term "place" in the Federal Tort Claims Act means the political entity, in this case Oregon, whose laws shall govern the action against the United States "in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674. There can be no question but that Oregon would be re-

quired to apply maritime law if this were an action between private parties, since a tort action for injury or death occurring upon navigable waters is within the exclusive reach of maritime law.

*Id.* at 318, 80 S.Ct. at 345, 4 L.Ed.2d at 309 & 310 n. 7; *accord, Gowdy v. United States*, 412 F.2d 525, 527 (6th Cir.), *cert. denied*, 396 U.S. 960, 90 S.Ct. 437, 24 L.Ed.2d 425 (1969); *Ira S. Bushey & Sons, Inc. v. United States*, 276 F.Supp. 518, 524 (E.D.N.Y.1967), *aff'd*, 398 F.2d 167, 168 (2d Cir. 1968). Maritime law is, of course, federal law; as *Hess* demonstrates, federal law may provide the rule of decision in an FTCA action when the state court in the state where the act or omission occurred would apply federal law in a like action between private parties.

The United States would distinguish *Hess* and the other FTCA-maritime tort cases on the ground that those decisions are limited to instances in which the application of federal law is mandated by an exclusive grant of jurisdiction in Article III of the Constitution and by 28 U.S.C. § 1333 which provides for original federal jurisdiction, "exclusive of the courts of the States," in civil cases of admiralty or maritime jurisdiction. Thus, the United States contends that the fact that Oregon would be required to apply federal law to a maritime tort cannot be analogized to establish that a state court would be required to apply federal common law adopted under the *Clearfield* doctrine because no question of constitutionally exclusive federal jurisdiction would there be involved. This argument fails because it is based on a distinction without a difference. Although the *Clearfield* progeny would generally or perhaps always arise in circumstances outside an exclusive grant of Article III jurisdiction, a federal rule established pursuant to the *Clearfield* doctrine is nevertheless the law of the land under the Supremacy Clause.

Returning to the hypothetical discussed above, the Supreme Court decision in the fireworks case would, as it is described, preempt state law; in such circumstances, the operative law would be the federal rule

of liability, pursuant to the Supremacy Clause, and the state court would be required to apply that federal law. This conclusion is supported by dicta in *Lambertson v. United States,* 528 F.2d 441 (2d Cir. 1976), an FTCA action involving a nonmaritime alleged tort. The *Lambertson* court stated:

> The "law of the place" means the "whole law" of the state where the incident took place, *i. e.,* "the principles of law developed in the common law and refined by statute and judicial decision." *Richards v. United States* . . . .
>
> The purpose of the Act was to remove the Government's sovereign immunity from suits in tort and, with certain exceptions, to render it liable "as a private individual would be under like circumstances." *Id.* . . . Thus, if the state would look to a state *or federal* statute in determining the liability of a private person for the tort in question, the same statute will be applied in measuring the conduct of the Government; otherwise it will not.

*Id.* at 443–45 (emphasis added), *citing Hess v. United States, supra,* and *Gowdy v. United States, supra.*

The conceptual difficulty that appears in the United States' argument that no liability would flow to the United States in the absence of a *state* law imposing liability arises because no preexisting body of preemptive federal common law of railroad tort liability has been declared, in contrast to the situation presented in the admiralty and maritime tort cases. If the Supreme Court had, for example, decided the fireworks case in favor of preemption as suggested in the hypothetical above, then this court would be faced only with the question whether that federal common law of liability, applicable in a parallel action between those private parties, should also apply in an FTCA action. That decision would be straightforward in view of the Act's mandate that the United States be liable in the same manner as a private party. The difficulty here, of course, is that no body of federal common law presently exists governing railroad tort cases. The question whether this court should create a federal

common law on the subject is wholly divorced from the question, under consideration at this point, whether the FTCA would preclude the application of federal common law. The United States' argument intermingles the two questions: (1) should federal common law govern an action between private parties under similar circumstances and (2) if a federal common law on that liability existed, should it govern the liability of the United States in an action under the FTCA. The two cases on which the United States relies also intermingle the two questions with resulting confusion: *Bowen v. United States,* 570 F.2d 1311 (7th Cir. 1978), and *Swanson v. United States,* 435 F.Supp. 654 (S.D.N.Y.1977).

The *Bowen* case arose from the crash of a private aircraft. The pilot-plaintiff sued under the FTCA alleging that the crash resulted from the negligence of federal air traffic controllers. On appeal from the district court's granting of a summary judgment motion by the United States, plaintiff argued for the first time that "the federal government's massive regulation of the nation's airways has preempted the field of aviation law, and that therefore federal common law, which should include the doctrine of comparative negligence, should be applied." *Id.* at 1316. The plaintiff relied on *Kohr v. Allegheny Airlines, Inc.,* 504 F.2d 400 (7th Cir. 1974), *cert. denied,* 421 U.S. 978, 95 S.Ct. 1980, 44 L.Ed.2d 470 (1975). The *Bowen* court noted that it need not consider the argument because it had not been presented to the district court but proceeded to reject the argument on substantive grounds as well. The court stated:

> Although *Kohr* held that a federal rule of contribution and indemnity among joint tort-feasors should control in aviation collision cases, and that rule applied to claims of the United States for contribution and indemnity, the court did not have before it the question of whether the law referred to in the Federal Tort Claims Act, *viz.,* "the law of the place where the act or omission occurred," is federal law or state law. The *Richards* case, which antedated *Kohr* and involved

facts very similar to those in the case at bar, expressly holds that the law to which the statutory phrase refers is state law. *Bowen v. United States, supra* at 1316. As noted above, *Richards* did not face the question whether to apply federal law instead of state law so its designation of the appropriate state law to apply does not expressly hold that *only* state law may govern even when federal law would otherwise preempt. The *Bowen* court next examined the Supreme Court's decision in *Miree v. DeKalb County, supra,* and concluded that *Miree* "strongly suggests that the Supreme Court is still of the view that state law governs in aviation tort claims brought under the Federal Tort Claims Act." *Id.* at 1316. For that reason, the court declined to apply a federal common law of liability in the case. The court's reasoning mingles the question whether the FTCA precludes the application of federal law and the question whether federal law does, in fact, preempt state law. The discussion of *Miree* looks to the merits of the second question but is used as authority for a decision on the first. The *Swanson* decision, which reached the same conclusion as *Bowen,* suffers from the same intermingling of the two questions. Neither decision can afford a basis on which this court may act.[8]

■ At this point, this court is concerned solely with the question whether the FTCA mandates that only state law may govern the liability of the United States even if an otherwise preemptive federal law would govern the liability of a private person similarly situated. This question is wholly unrelated to whether federal law does or should preempt state liability law under the circumstances of this case. Careful consideration of the FTCA and its necessary interrelation with the Supremacy Clause leads inexorably to the conclusion that the FTCA would not preclude the application of preemptive federal law on liability in an FTCA action if that law would govern the liability of a similarly situated private defendant. No other conclusion follows the mandate of the Act that the United States shall be liable "in the same manner and to the same extent as a private individual under like circumstances." Moreover, no other conclusion would satisfy the requirements of the Supremacy Clause. Accordingly, the United States' argument that the FTCA precludes the application of federal law is rejected for the reasons stated.

■ Having concluded that the FTCA does not preclude the application of a preemptive federal law, the next question is whether, in fact, the federal regulatory programs at stake require that federal law preempt under the circumstances of this

---

**8.** The United States also argues, in passing, that

> Southern Pacific's circuitous reasoning stands for the rather attenuated proposition that a state court in California would apply federal common law in the present case but could then adopt its own law as the federal common law rule—all in the absence of any state statute or regulation requiring or permitting it to do so. Since *Richards* requires the federal court to apply state choice of law rules, it is incumbent upon Southern Pacific to therefore cite state authority in California for the proposition that a California state court would adopt a *federal common law* rule. This Southern Pacific has not done and it seems unlikely that it can.

United States' Brief, filed Oct. 4, 1978, at 55. This argument is of no merit. The issue is not whether state law, in California, Nevada, or any other state, requires or permits the application of federal common law in an appropriate instance. If federal common law should properly apply under the facts of a particular case, then no authority for the use of federal common law is necessary in the law of the states; even a state law rule forbidding the use of federal common law would be of no effect pursuant to the Supremacy Clause. The issue is not what the state court would do, but what any court, state or federal, is required to do under the Supremacy Clause; if the Constitution or the Congress mandate the application of federal common law, then all courts must follow that law. If a state court declined to proceed as required by the Supremacy Clause, then the Supreme Court is empowered to reverse the state court judgment. *See Local 174, Teamsters, Chauffeurs, Warehousemen & Helpers of America v. Lucas Flour Co.,* 369 U.S. 95, 103, 82 S.Ct. 571, 576, 7 L.Ed.2d 593, 599 (1962), *followed in Walsh v. Schlecht,* 429 U.S. 401, 406, 97 S.Ct. 679, 684, 50 L.Ed.2d 641, 648 (1977), *and Carillo v. Local 1115 Joint Board Nursing Home & Hospital Employees Division,* 441 F.Supp. 619, 621 (S.D.N.Y.1977).

case pursuant to the *Clearfield* doctrine. In considering this question, no weight may be given to the fact that the United States is a defendant in the action. Although the United States' involvement *vel non* as a plaintiff or defendant in the action has been considered as a relevant factor in certain of the *Clearfield* progeny, use of that factor in this action would violate the mandate of the FTCA that the liability of the United States be determined in the same manner as that of a private person. Accordingly, for purposes of the following discussion, it will be assumed that the defendant is a private manufacturer and shipper of fireworks; such an assumption will conform to the mandate of the Act and will do no violence to the facts herein.

(4) *Federal Common Law Preemption of the Determination of Liability in Railroad Related Torts*

 Both Southern Pacific and the United States agree that the federal courts have the power to adopt federal common law in appropriate instances in which the rights and duties of the parties have a federal source. The United States contends, however, that the requisite federal interest necessary to invoke the power to declare a federal common law of railroad liability is absent in the instant case. The parties do not cite, and this court has not found, precedent directly on point. Cases do exist considering the question of a federal common law of liability in the context of the Motor Carrier Act, 49 U.S.C. § 301 *et seq.*, the Federal Aviation Act, 49 U.S.C. § 1301 *et seq.*, the Federal Communications Act, 47 U.S.C. § 151 *et seq.*, and certain of the federal statutes governing rail transportation including the Safety Appliance Acts, 45 U.S.C. § 1 *et seq.* Related questions are considered in cases under the Carmack Amendment, 49 U.S.C. § 20(11), (12), and the Uniform Bill of Lading Act, 49 U.S.C. § 81 *et seq.* The parties offer certain of these cases as providing the answer to the present question, but none of the

cases, standing alone, can be dispositive. Nevertheless, the cases do provide the framework within which a decision is to be made.

Consideration may first be given to *Pierce v. Cook,* 437 F.2d 11.9 (10th Cir. 1970),[9] a tort action against a shipper arising from an accident allegedly caused by a motor carrier regulated under the Motor Carrier Act, which was modeled on the preexisting federal regulation of railroads. The plaintiffs argued that,

> in order to carry out the national policy and purposes of Congress in enacting Part II of the Interstate Commerce Act (the Motor Carrier Act), 49 U.S.C. § 301, et seq., it is necessary to determine the liability of Cook [the shipper] under the facts in the instant case in accordance with federal common law and not by the law of the state in which the collision resulting in decedent's death and Ellenwood's injuries occurred.

*Id.* at 1123. Plaintiffs' counsel conceded that they had been unable to find "any decision by a state or federal court which passed upon and sustained the contention they make here." After examination of the Act's provisions, the court held:

> There is no language in the Motor Carrier Act indicating any intent of Congress to supersede state tort law with respect to negligence or wrongful death liability of a shipper. Hence, state law governs with respect to Cook's liability in the instant case.

*Id.* at 1126, *citing Rogers v. Ray Gardner Flying Service, Inc.,* 435 F.2d 1389 (5th Cir. 1970), *and Rosdail v. Western Aviation, Inc.,* 297 F.Supp. 681 (D.Colo.1969).

The cases on which *Pierce* relied are two of the many cases in which it has been argued that the federal regulation of aviation is sufficiently extensive that a federal common law of liability should govern. The plaintiffs in *Rosdail* brought an action against the lessor and sublessor of an air-

---

**9.** The case came before the Tenth Circuit again some five years later because of an intervening change in the state law. At that time, the court indicated its continuing approval of its earlier conclusion that state law must govern. *Pierce v. Cook,* 518 F.2d 720, 722 (10th Cir. 1975).

craft for injuries and death arising from a crash, seeking to impute to them the alleged liability of the lessee-pilot. The court considered the two possible arguments in favor of a federal common law imputing such liability:

One, Congress through the Supremacy Clause of the United States Constitution has defined the legal relationship between owners and lessors of aircraft and their bailees not only for purposes of the Federal Aviation Program, but for purposes of tort liability suits entertained by the state courts. As a consequence, state courts would have to recognize owner and lessor liability for bailee negligence even were state law to the contrary. The second approach is that a private right of action has been created by the Federal Aviation Program § 1301(26). Accordingly, plaintiffs could sue on the federal cause of action even though no state common or statutory law would allow such a recovery.

*Id.* at 683. The court rejected the plaintiffs' arguments:

The effect of § 1301(26), urged by plaintiffs, is to alter common law tort liability to include certain persons who under common law would not have been charged with liability . . . . We disagree, however, that Congress intended to alter common law principles with a definitional section of a regulatory scheme. The Federal Aviation Program regulates the licensing, inspection and registration of aircraft and airmen. It makes no provision for its application to tort liability and in fact provides that nothing in the Program shall abridge or alter the remedies now existing at common law or by statute. 49 U.S.C. § 1506.

*Id.* at 684. Accordingly, the court ordered plaintiffs' allegations of liability based on the Federal Aviation Program stricken from the complaint. *Rosdail* was followed in *Rogers v. Ray Gardner Flying Service, Inc., supra,* a wrongful death action arising from the crash of a private plane which again considered the effect of section 1301(26) of the Federal Aviation Program. The Fifth Circuit did not question the power of Congress to preempt state law under the Commerce Clause as to the liability for injuries resulting from air crashes. Nonetheless, the court concluded "[t]ort law has historically been left to the states" and that the federal courts should not assume an alteration in that historical approach in the absence of a clear indication of the intent of Congress. *Id.* at 1394–95; *accord, Sanz v. Renton Aviation, Inc.,* 511 F.2d 1027 (9th Cir. 1975); *McCord v. Dixie Aviation Corp.,* 450 F.2d 1129, 1131 (10th Cir. 1971). The *McCord* court declared:

if Congress had intended to impose strict liability on an owner-bailor, it was capable of clearly and directly so providing. We believe that Congress had no intention of providing for tort liability in the enactment of the Federal Aviation Program. That Act, and the agency rules promulgated thereunder, regulates the licensing, inspection and registration of aircraft and of pilots. . . . The Act particularly provides that nothing therein shall in any way abridge or alter the remedies now existing at common law or by statute. 49 U.S.C. § 1506. . . .

We are not unmindful of those decisions finding jurisdiction under federal common law, notwithstanding lack of Congressional intent, express or implied, declaring a right to recover for tort or breach of contract. *Clearfield Trust Co. v. United States,* . . . *Ivy Broadcasting Company v. American Telephone & Telegraph Company,* 391 F.2d 486 (2nd Cir. 1968). In those cases the courts held that the federal interest was so strong and the regulatory statutes so comprehensive that a remedy for tort or breach of contract existed under federal common law.

There is no showing by the appellants that there is a compelling federal interest justifying the application of the federal common law rule to fashion a cause of action in tort which would subject all owners and lessors of airplanes to damage judgments contrary to existing com-

mon law. We believe that to do so would constitute abusive judicial law-making. Recognition of the separation of power rule leads us to the conclusion that the contentions raised by the appellants here should be directed to the law-making power of Congress and not to the adjudicative power of this court.

*Id.* at 1131.[10]

The *McCord* court distinguished both *Clearfield* and Ivy Broadcasting Co. v. American Telephone and Telegraph Co., 391 F.2d 486 (2d Cir. 1968). *Ivy*, one of the cases on which Southern Pacific relies, raised the question whether federal law would govern a claim for negligence and breach of contract in the rendition of interstate telephone service by a carrier regulated under the Federal Communications Act. That Act was modeled on the Interstate Commerce Act, and, in fact, communications carriers were regulated under the latter Act from 1910 to 1934 when regulation was placed in the hands of the newly-created Federal Communications Commission. Relying on the *Clearfield* doctrine, the Second Circuit held that federal law would govern:

> In the absence of any statutory provision relating to a carrier's liability for negligence or breach of contract, the courts must determine whether these questions should be left to state law or whether the federal interest in the result of such cases is so great that they should be controlled by federal common law. See *Clearfield Trust Co. v. United States [supra].*
>
> The fact that a contract is subject to federal regulation does not, in itself, dem-

onstrate that Congress meant all aspects of its performance or nonperformance to be governed by federal law rather than by the state law applicable to similar contracts in businesses not under federal regulation. . . .

. . . . The question then is whether the federal statutory scheme for the regulation of interstate communications service indicates a congressional policy requiring that the duties and liabilities under contracts for the provision of such service be determined according to federal rules in order to assure uniformity of rates and service.

Congress has enacted comprehensive legislation regulating common carriers engaged in interstate telegraph and telephone transmission. . . .

The Supreme Court has held that the establishment of this broad scheme for the regulation of interstate service by communications carriers indicates an intent on the part of Congress to occupy the field to the exclusion of state law.

. . .

In *Western Union Tel. Co. v. Boegli,* 251 U.S. 315, 40 S.Ct. 167, 64 L.Ed. 281 (1920), the Supreme Court held state law inapplicable to a question concerning the carrier's liability for negligence which was not specifically covered by the tariff provisions. In that case the state court had applied a state statute imposing a penalty for failure to deliver promptly a telegram which had been sent in interstate commerce. The Supreme Court reversed, holding that the state penalty

---

10. Two Supreme Court decisions are relevant here although they are not directly on point. In *Miree v. DeKalb County, supra,* the Court concluded that state law would govern whether those injured as a result of an air crash could sue as third-party beneficiaries of a contract between the county responsible for the airfield and the Federal Aviation Administration. Although the case did not directly concern the development of a federal common law of liability in the aviation tort area, at least one court has read the decision to indicate a rejection of the applicability of federal common law. *Bowen v. United States, supra* at 1316. In addition,

in *Nader v. Allegheny Airlines,* 426 U.S. 290, 96 S.Ct. 1978, 48 L.Ed.2d 643 (1976), the Court recognized the applicability of a state common law tort for a passenger "bumped" by the airline because of overbooking, despite the authority granted to the Civil Aeronautics Board to regulate the area through its power to issue cease and desist orders to prevent unfair or deceptive practices. The Court concluded that the savings clause in 49 U.S.C. § 1506, providing that nothing in the Act shall abridge remedies existing at common law or by statute, saved all state remedies except those absolutely inconsistent with the federal Act.

could not be imposed because the provisions of the Act of June 18, 1910, "so clearly establish the purpose of Congress to subject such companies to a uniform national rule as to cause it to be certain that there was no room thereafter for the exercise by the several states of power to regulate" in this area.

*Id.* at 490–91. Similar decisions have been reached in other cases under the Federal Communications Act. *E. g., Farmers Educational & Cooperative Union of America v. WDAY, Inc.,* 360 U.S. 525, 533–535, 79 S.Ct. 1302, 1307, 1308, 3 L.Ed.2d 1407, 1414–15 (1959); *O'Brien v. Western Union Telegraph Co.,* 113 F.2d 539, 541 (1st Cir. 1940).

Examination of these decisions under various statutes modeled on the Interstate Commerce Act provides a framework for decision in the instant case, but none of those decisions can be direct precedent. In each instance, congressional intent and the policy and purpose of the particular Act are the guiding lights, and a conclusion that preemption is appropriate under the Federal Communications Act or inappropriate under the Federal Aviation Act has little bearing on the purposes and requirements of the federal statutes governing this case.

In addition to reliance on certain of the foregoing cases, Southern Pacific directs the court's attention to decisions and statutes governing railroads. Thus, it is pointed out that federal law controls the interpretation of bills of lading. In *Illinois Steel Co. v. Baltimore & O. R. R.,* 320 U.S. 508, 64 S.Ct. 322, 88 L.Ed. 259 (1944), on appeal from the Illinois state courts, the decision turned on the interpretation of certain clauses in the uniform bill of lading approved by the Interstate Commerce Commission (ICC). The Court declared:

Pursuant to Congressional authority, the Interstate Commerce Commission has prescribed uniform forms of bills of lading, including that involved in this case. . . . In promulgating them, the Commission has stated that it was doing so in the interest of uniformity and to prevent discriminations. . . .

The construction of the clauses of a bill of lading, adopted by the Commission and prescribed by Congress for interstate rail shipments, presents a federal question. . . . Such has been the consistent ruling of this Court where the question presented concerned the conditions in bills of lading affecting the liability of the carrier such as are required by the Carmack Amendment . . . .

Since the clauses of the uniform bill of lading govern the rights of the parties to an interstate shipment and are prescribed by Congress and the Commission in the exercise of the commerce power, they have the force of federal law and questions as to their meaning arise under the laws and Constitution of the United States.

*Id.* at 510, 64 S.Ct. at 324, 88 L.Ed. at 263; *accord, Adams Express Co. v. Croninger,* 226 U.S. 491, 33 S.Ct. 148, 57 L.Ed. 314 (1913); *Datapoint Corp. v. Lee Way Motor Freight Inc.,* 572 F.2d 1128, 1130–31 (5th Cir. 1978). Similarly, questions concerning the application and interpretation of the Carmack Amendment, 49 U.S.C. § 20(11), (12), are governed by federal law, although in certain instances the content of that federal law is derived from state law doctrines. For example, *Perini-North River Associates v. Chesapeake & O. Ry.,* 562 F.2d 269, 273 (3d Cir. 1977), incorporated state estoppel rules into federal law as applied to the determination of timely filing of a Carmack Amendment claim.

The foregoing are two of the instances to which Southern Pacific points in support of its argument that federal law should govern the question of liability in this case. The fact that federal law will govern the interpretation and application of these federal statutes insofar as they may interrelate with questions that arise in this case does not demonstrate, *a fortiori,* that federal law must also govern the question of liability, that is, the use of contributory or comparative negligence standards. The same difficulty is presented by other federal statutes from which Southern Pacific would draw a *Clearfield* requirement that federal law govern the question of liability.

Thus, Southern Pacific points to federal law regulating rate-making, 49 U.S.C. §§ 1(5), (6), 3, 15. The United States responds that the rates under which the explosives were shipped in this instance were established pursuant to 49 U.S.C. § 22, and comments that federal regulation of railroad freight rates has no bearing on the case in any event. Insofar as freight rates and rate-making are potentially relevant, this court is prepared to conclude that federal law would govern the interpretation of the federal rate-making regulations. That conclusion does not lead to a further conclusion that this court should declare a federal common law of liability in railroad torts merely because federal law applies to and prohibits discrimination in interstate rail freight rates.

■ It is important to keep in mind the circumstances in which interstitial federal lawmaking is appropriate. As declared in *Little Lake Misere,* the federal courts are empowered to declare federal common law rules as necessary to fill in interstitially or to effectuate the statutory patterns of the congressional enactments. The power to act interstitially to effect the congressional purpose is limited to issues related to the specific enactment. Thus, in an appropriate case, this court might declare, as a matter of federal common law, that the specific rate-making powers granted to federal agencies necessarily resulted in certain collateral consequences or obligations in connection with a railroad's charging those rates to a member of the public. The attempt to argue that federal power over rate-making would permit the declaration of a federal common law of tort liability in the circumstances of this case fails because it seeks to stretch the power of interstitial lawmaking over too wide a field. Specific discussion of many of the other federal statutes relied on by Southern Pacific is unnecessary because they are similarly inappropriate bases on which to ground a federal common law of railroad tort liability. These statutes include 49 U.S.C. § 1(4), concerning a common carrier's duty to furnish transportation and establish through routes, and 49 U.S.C. § 1(7), concerning the

circumstances under which free passes may be issued.

There remain the statutes cited in support of a federal common law of tort liability that concern the safety of rail transportation and the shipment of hazardous materials. If a federal common law should be declared, it could most properly derive from these statutes. The first of these is 49 U.S.C. § 1(11), which provides in part: "It shall be the duty of every carrier by railroad . . . to furnish safe and adequate car service . . . ." Section 26 of the same Title provides, in short, that the Interstate Commerce Commission is empowered to require the installation of "appliances, methods, and systems intended to promote the safety of railroad operation." 49 U.S.C. § 26. In addition to these sections codified in Title 49, there are a number of enactments codified in Title 45 which concern railroad safety and are commonly referred to as the Federal Safety Appliance Acts. Many of these provisions date from the late nineteenth century. One of these early enactments, for example, makes it unlawful for an interstate common carrier to haul or permit the hauling on its line of any car not equipped with automatic couplers. 45 U.S.C. § 2, *codifying* Act of Mar. 2, 1893, ch. 196, § 2, 27 Stat. 531. Although certain of the Safety Appliance Acts would appear to have no direct bearing on the instant case, others have been put in issue by the parties either affirmatively or by way of defense. For example, Southern Pacific contends that the United States violated 45 U.S.C. § 9, one of the Safety Appliance Acts known as the Federal Power Brake Law. Southern Pacific's Brief, filed Nov. 3, 1977, at 4. The question whether the United States did, in fact, violate the Act is of necessity a federal question, and terms in the Act must be construed under federal law. Nonetheless, the cases are clear that the question of liability arising from a violation of the Act is determined under state law. The most recent Supreme Court case on the point is *Crane v. Cedar Rapids & I. C. R. R.,* 395 U.S. 164, 165, 89 S.Ct. 1706, 1707, 23 L.Ed.2d 176 (1969), which raised the question

whether a State may take the defense of contributory negligence available to a railroad sued by a nonemployee for damages for personal injuries caused by the railroad's failure to maintain its freight cars "with couplers coupling automatically by impact," as required by § 2 of the Federal Safety Appliance Act of 1893 . . . .

The *Crane* action arose when a nonemployee of the railroad working on the railcars on his employer's siding was injured allegedly as a result of a malfunctioning coupler. He sued in the Iowa state courts, and the jury was instructed on Iowa's tort law requirement that he show that he was free from contributory negligence. The jury returned a verdict for the railroad; the Iowa Supreme Court affirmed, and the case was brought to the Supreme Court. The Court declared:

> The Safety Appliance Act did not create a federal cause of action for either employees or nonemployees seeking damages for injuries resulting from a railroad's violation of the Act. *Moore v. C. & O. R. Co.*, 291 U.S. 205, 54 S.Ct. 402, 78 L.Ed. 755 (1934). Congress did, however, subsequently provide a cause of action for employees: The cause of action created by the Federal Employers' Liability Act of 1908, . . . 45 U.S.C. § 51 et seq., embraces claims of an employee based on violations of the Safety Appliance Act. In such actions, the injured employee is required to prove only the statutory violation and thus is relieved of the burden of proving negligence . . . and the railroad is deprived of the defenses of contributory negligence and assumption of risk
>
> . . . . .
>
> In contrast, the nonemployee must look for his remedy to a common-law action in tort, which is to say that he must sue in a state court, in the absence of diversity, to implement a state cause of action. . . . "[T]he right to recover damages sustained . . . . through the breach of duty sprang from the principle of the common law . . . and was left to

be enforced accordingly . . . ." [*Id.* at 215, 54 S.Ct. at 406, 78 L.Ed. at 762]. In consequence, we have consistently held that under the present statutory scheme the definition of causation and the availability of the defenses of assumption of risk and contributory negligence are left to state law. . . . Our examination of the relevant legislative materials convinces us that this line of decisions should be reaffirmed.

*Id.* at 166, 89 S.Ct. at 1708, 23 L.Ed.2d at 179–80. The Court commented that it recognized the injustice of denying recovery to a nonemployee when an employee would recover on the same facts but stated that "it is for Congress to amend the statute to prevent such injustice. It is not permitted the Court to rewrite the statute." *Id.* at 167, 89 S.Ct. at 1709, 23 L.Ed.2d at 180. Justice Black, joined by Justices Warren and Douglas, dissented, stating that Congress had enacted the Safety Appliance Act and that "the question of a railroad's liability to a person injured by a violation of that Act is a federal, not a state, question." *Id.* at 167, 89 S.Ct. at 1709, 23 L.Ed.2d at 180.

*Crane* reaffirmed a line of earlier decisions to the same effect. For example, *Tipton v. Atchison, T. & S. F. R. R.*, 298 U.S. 141, 56 S.Ct. 715, 80 L.Ed. 1091 (1936), held that "the Safety Appliance Acts leave the nature and the incidents of the remedy to the law of the states. . . . They do not touch the common or statute law of a state governing venue, limitations, contributory negligence, or recovery for death by wrongful act." *Id.* at 146, 56 S.Ct. at 716, 80 L.Ed. at 1095 (footnotes omitted); *accord, Fairport, P. & E. R. R. v. Meredith*, 292 U.S. 589, 594–598, 54 S.Ct. 826, 827–829, 78 L.Ed. 1446, 1450–52 (1934); *Moore v. Chesapeake & O. R. R.*, 291 U.S. 205, 214–216 & n. 7, 54 S.Ct. 402, 405–406 & n. 7, 78 L.Ed. 755, 762–63 & n. 7 (1934) (noting, however, that the question as to the interpretation of the Safety Appliance Acts was a federal question); *Hunter v. Missouri-K.-T. R. R.*, 433 F.2d 352, 353 (10th Cir. 1970); *Jacobson v. New York, N. H. & H. R. R.*, 206 F.2d 153, 157–58 (1st Cir. 1953), aff'd

*per curiam,* 347 U.S. 909, 74 S.Ct. 474, 98 L.Ed. 1067 (1954).

Southern Pacific contends that the cases under the Safety Appliance Acts should not be read to restrict this court's power to declare a federal common law of railroad liability. Initially, Southern Pacific points out that these statutes were enacted at a time when the states were virtually uniform in applying a rule of contributory negligence; thus, the congressional decision to leave the matter to state law resulted in uniformity. Now, however, more than half of the states have replaced contributory negligence with "a variety of more equitable rules." Southern Pacific's Brief, filed Oct. 24, 1978, at 10, *citing Daly v. General Motors Corp.,* 20 Cal.3d 725, 739, 144 Cal. Rptr. 380, 388, 575 P.2d 1162, 1170 (1978). Thus, it is urged that this court should reinstate uniformity by adopting a federal common law rule. This argument is without merit. The statutes comprising Safety Appliance Acts were enacted over a period lasting more than half a century. Even if it can be said accurately that the states were relatively uniform in the application of the contributory negligence rule during that time, considerable variation existed as to a number of other doctrines affecting an injured person's recovery for damages arising from a violation of one of the Acts. Doctrines of assumption of the risk, last clear chance, survival of actions, and recovery for death by wrongful act, as well as the evidentiary effect of a violation of a statutory duty, varied between states and overtime. The cases interpreting the Safety Appliance Acts declined to institute a regime of uniformity as to these matters despite the fact that the lack of uniformity would result in liability in some states but nonliability in others on the identical injury. Southern Pacific's argument that Congress enacted the Safety Appliance Acts against a uniform corpus juris of the states on the question of contributory negligence looks too narrowly at the question of uniformity of recovery.

As a second argument, Southern Pacific contends that cases like *Crane* involved an injured person who was not moving in interstate commerce.

It would indeed be anomalous and an invasion of an area of traditionally local concern if the rights of a person injured while driving to work or while working at a warehouse differed because he was hit by a train rather than an auto or fell off a train rather than a warehouse loading dock. The effect of a person's contributory negligence is a matter of local concern and should be left to state law. Southern Pacific's Brief, filed Oct. 24, 1978 at 16 (footnote omitted). In contrast, it is urged that the instant litigation concerns whether an interstate carrier's rights should vary from state to state:

> The carrier, like the railroad employee [mentioned] in *Crane,* or a shipper's freight, moves regularly from one state to another pursuant to federal statutes and regulations governing *both parties* to the employer/employee and shipper/carrier relationship. Uniform rules govern the shipper's and employer-employee's rights under, respectively, the Carmack Amendment and the Federal Employer's Liability Act. It is, therefore, anomalous that only the carrier's rights should differ from state to state irrespective of the impact of federal policy and despite the fact that the Interstate Commerce Act requires carriers to charge uniform rates.

*Id.* Application of this argument to lawsuits arising from an accident like that in the instant case would have the result that private persons injured would look to state law for their recovery while the carrier and shipper would look to federal law. Such a result would be certain to inject a lack of uniformity based on the status of the parties to each suit. Moreover, a number of the injured persons might well contend that they were substantially involved in interstate commerce and so should have the benefits of the federal law. For example, the plaintiff in *Crane*

> was in the employ of Cargill, Inc., at its Cedar Rapids, Iowa, meal house and elevator on the line of respondent railroad. Petitioner's duties were to move, weigh,

and load freight cars spotted by respondent on Cargill's siding track.

*Crane v. Cedar Rapids & I. C. R. R., supra* 395 U.S. at 165, 89 S.Ct. at 1708, 23 L.Ed.2d at 179. Such a person could argue that his injury arose directly from involvement in the interstate shipment of freight. Where should the line be drawn? The answer to that question is properly left to Congress, not the courts. Congress has decided the extent to which national uniformity is to be mandated by federal law, and it is not for this court to extend that uniformity beyond the framework set forth by Congress. As the Supreme Court noted in *Crane,* Congress has concluded that certain questions and certain types of liability should be decided uniformly while other questions and types of liability have been left to the states. The Court declared:

> We recognize the injustice of denying recovery to a nonemployee which would not be denied to an employee performing the same task in the same manner as did petitioner. But it is for Congress to amend the statute to prevent such injustice. It is not permitted the Court to rewrite the statute.

*Id.* at 167, 89 S.Ct. at 1709, 23 L.Ed.2d at 180 (footnote omitted).

The guiding principle for the Supreme Court and for this court is the intent of Congress. In many instances in which interstitial lawmaking is appropriate, Congress has been silent on the specific point in issue. In such cases, the courts examine the scope and framework of the applicable congressional enactments to determine whether effectuation of the congressional intent embodied therein mandates the development of federal common law to govern an area not considered by Congress. Nonetheless, the inquiry is to congressional intent: having enacted a given body of law, would Congress have meant to leave a related question to state regulation or would Congress necessarily have intended to encompass the law governing that question within the framework of the federal law, had the question at issue been considered.

Congress has enacted the present federal regulatory program governing railroads over almost a century. The Interstate Commerce Act dates from 1887, but it has been amended and supplemented frequently since then. The first of the Safety Appliance Acts was passed in 1893; other Safety Appliance Acts followed in 1903, 1910 and 1920, with amendments to the Acts in 1957, 1958 and 1976. As noted earlier, Congress acts against the corpus juris of the states; Congress also acts against the total corpus juris of the nation. The Supreme Court has long interpreted the Safety Appliance Acts to impose obligations on the railroads but not to establish a federal rule of liability. Congress must be deemed to act with reference to the well established holding of the Court that the remedies for railroad related accidents involving non-employees are governed by state law. In the absence of an indication from Congress that it intends to reject that interpretation or to institute a new federally-uniform approach, this court is not at liberty to do so. No such indication can be found in the statutes discussed so far.

There remain the statutes governing hazardous materials and the Federal Railroad Safety Act of 1970. Southern Pacific has directed the court's attention to the Hazardous Materials Transportation Act, 49 U.S.C. § 1801 *et seq.,* a statute governing certain aspects of the transportation of hazardous materials by railroads, motor carriers, airplanes, and other forms of transportation. The United States objects to the citation to this statute on the ground that it was enacted in 1975, after the explosions at issue in this case. Even aside from the difficulties presented by an argument that a federal common law should be found in part from a 1975 statute and then retroactively applied to determine liability as to a 1973 incident, this Act evinces no intent to encompass the question of tort liability within the framework of federal law. The Act empowers the Secretary of Transportation to promulgate regulations defining "hazardous materials" and governing

> any safety aspect of the transportation of
> hazardous materials which the Secretary

deems necessary or appropriate, including but not limited to, the packing, repacking, handling, labeling, marking, placarding, and routing (other than with respect to pipelines) of hazardous materials, and the manufacture, fabrication, marking, maintenance, reconditioning, repairing, or testing of a package or container which is represented, marked, certified, or sold . . . for use in the transportation of certain hazardous materials.

*Id.* § 1804(a). Moreover, the Secretary is authorized to promulgate criteria for handling hazardous materials. *Id.* § 1805(a). Violation of the regulations is subject to penalties, both civil and criminal, *id.* § 1809, and the Secretary may seek injunctive and other relief in the district court if an imminent hazard exists. *Id.* § 1810. The Act provides that state and local requirements which are inconsistent with the Act or the regulations are preempted, *id.* § 1811(a), but it specifically provides:

> Any requirement, of a State or political subdivision thereof, which is not consistent with any requirement set forth in this chapter, or in a regulation issued under this chapter, is not preempted if, upon the application of an appropriate State agency, the Secretary determines . . . that such requirement (1) affords an equal or greater level of protection to the public than is afforded by the requirements of this chapter or of regulations issued under this chapter and (2) does not unreasonably burden commerce. Such requirement shall not be preempted to the extent specified in such determination by the Secretary for so long as such State or political subdivision thereof continues to administer and enforce effectively such requirement.

*Id.* § 1811(b). Thus, the Act explicitly expresses a congressional intent not to preempt state laws unless those laws are contrary to the scheme of federal regulation. Finally, the Act is wholly silent as to the remedies available to a private person injured by a violation of the Act or regulations. Similar silence in the context of the Safety Appliance Acts has long been interpreted to leave the question of remedies to state law, and no basis for a different conclusion under this Act is apparent. The same result is appropriate as to the federal regulation of hazardous materials, which predated the Roseville explosions, under the Explosives Transportation Act, 18 U.S.C. §§ 831–35. That Act authorized the promulgation of regulations for the safe transportation of explosives and other dangerous articles and provided criminal penalties for violations. As with the Hazardous Materials Transportation Act, the Explosives Transportation Act evidences no intent to affect state regulation of tort liability.[11]

The only remaining federal statute from which a federal common law of railroad tort liability might be drawn is the Federal Railroad Safety Act of 1970, 45 U.S.C. § 421 *et seq.* Unlike the Safety Appliance Acts which dealt with specific aspects of railroad safety, the 1970 Act's declared purpose

> is to promote safety in all areas of railroad operations and to reduce railroad-related accidents, and to reduce deaths and injuries to persons and to reduce damage to property caused by accidents involving any carrier of hazardous materials.

45 U.S.C. § 421. Section 434 of the Act provides:

> The Congress declares that laws, rules, regulations, orders, and standards relating to railroad safety shall be nationally uniform to the extent practicable. A State may adopt or continue in force any law, rule, regulation, order, or standard relating to railroad safety until such time as the Secretary has adopted a rule, regulation, order, or standard covering the

---

11. In support, the United States directs the court's attention to the House Report which accompanied the Act:

Concerning the question of Federal preemption of State or local regulations relating to the transportation of dangerous articles, the Interstate Commerce Commission has stated that it is not its intent and of course the committee feels there is nothing in the bill to preempt the field to the exclusion of the States.

H.R.Rep.No.1975, *reprinted in* 1960 U.S.Code, Cong. & Admin.News 1960, pp. 3351, 3355.

subject matter of such State requirement. A State may adopt or continue in force an additional or more stringent law, rule, regulation, order, or standard relating to railroad safety when necessary to eliminate or reduce an essentially local safety hazard, and when not incompatible with any Federal law, rule, regulation, order, or standard, and when not creating an undue burden on interstate commerce.

Southern Pacific did not focus on this Act in arguing that federal common law should govern the field of railroad tort liability. This court has been unable to discover any decisions under the Act which support the development of such a federal common law to supplant state common or statutory law rules such as contributory negligence. Nonetheless, the Act evinces a clear congressional intent to preempt the regulation of railroad safety, and the cases interpreting the Act recognize that intent. For example, the question arose in *Chicago Transit Authority v. Flohr,* 570 F.2d 1305 (7th Cir. 1977), whether the transit authority was a railroad subject to regulation under the Act. Although the court concluded that Congress had not intended to bring rapid transit systems within the coverage of the Act, the court declared:

> The purpose of the Act was to provide comprehensive and uniform safety regulations in all areas of railroad operations. In so doing, Congress was proposing to fill gaps in statutory safety coverage which had grown so large as to render impossible any meaningful rail safety regulations. The Senate report emphasized this purpose:
>
>> "To date, scant attention has been paid to railroad safety at either the State or Federal levels. At present, there are several rail safety statutes, each one of which applies to some very specific safety hazard. The majority of these statutes are from 50 to 75 years old and were written when technology was quite different from what it is today. Some 95 percent of the causes of accidents on railroads are in no way covered by Federal statutes or State law. The Federal Government, for ex-

ample, has no jurisdiction over the design, construction, inspection, or maintenance of track, roadway, and bridges. Its authority with respect to freight and passenger cars applies only to safety appliances and certain aspects of the brake system. Car wheels, axles, which are major causative elements in many accidents, are not subject to Federal regulations." S.Rep.No.91–619, 91st Cong., 1st Sess. 4 (1969)

*Id.* at 1308; *accord, United States v. Missouri P. R. R.,* 553 F.2d 1156 (8th Cir. 1977). Similarly, in *National Association of Regulatory Utility Commissioners v. Coleman,* 542 F.2d 11, 13 (3d Cir. 1976), the court concluded that the Act authorized the promulgation of regulations that preempted state railroad accident reporting requirements:

> Section 434 expressly declares that a primary objective of the Act is the establishment of a nationally uniform system of regulation in the rail safety field. State adopted regulations, with the exception of those which are designed to eliminate an essentially local safety hazard, are permitted to continue in force only until such time as a federal regulation covering the same subject matter is promulgated. We believe these statutory provisions evince, as the district court determined, a "total preemptive intent."

Our conclusion that the Act was intended to preempt the field of rail safety is confirmed by the legislative history. The court in *Donelon v. New Orleans Terminal Co.,* 474 F.2d 1108, 1112 (5th Cir.), *cert. denied,* 414 U.S. 855, 94 S.Ct. 157, 38 L.Ed.2d 105 (1973), held that the Act's "regulatory scheme has pre-empted the field of railroad safety to the exclusion of whatever interest in regulating railroad safety [the plaintiff officials of Jefferson Parish in Louisiana] might otherwise have had outside the Act." For that reason, the court affirmed the issuance of an injunction prohibiting the plaintiffs from proceeding with a state court action for injunctive relief against allegedly unsafe railroad practices. Finally, *Capozzi v. Blanchette,* 433 F.Supp.

704 (W.D.N.Y.1977), is the only one of these cases in which an accident had occurred, in that instance because of an allegedly defective railcar. The *Capozzi* court ordered stricken the fifth and sixth causes of action in the complaint which sought a recall of all similarly defective railcars and an injunction against sale of such cars. The court stated:

> Plaintiffs do not cite any case in which such a recall and prohibition were permitted, but argue generally that such relief is appropriate. Railroad safety has been delegated by Congress to the Secretary of Transportation. 45 U.S.C. § 431. Inasmuch as Congress's delegation of authority to the Secretary has preempted the field, injunctive relief is not a remedy available for the correction of unsafe conditions.

*Id.* The court made no other comment.

Although the Federal Railroad Safety Act of 1970 and the cases construing it reflect the congressional intent to preempt the regulation of railroad safety and achieve national uniformity, no indication is given in the Act or its legislative history that Congress intended to preempt state tort liability doctrines affecting the remedies either for violation of the federal regulations in particular or for railroad related accidents in general. In the absence of such an indication of congressional intent, this court concludes that Congress intended no alteration in the prevailing scheme of federal law as it interrelates with state law. As discussed above, Congress acts within the framework of existing law, both state and federal, statutory and decisional. That framework clearly left the incidents of an action for recovery of damages to state law when Congress deliberated and enacted the 1970 Act; congressional silence should be deemed in this instance to leave the existing framework unaltered.

█ This court has, of necessity, examined the pertinent federal laws in a piecemeal fashion up to this point because different considerations apply to the different enactments. Southern Pacific's argument is based, not on any particular statute, but on the totality of federal regulation. Thus, it is appropriate to step back from the particular enactments and examine briefly the contention that the entirety of federal regulation mandates the application of a federal rule of liability. As the Supreme Court declared in *Sola Electric,* development and application of federal common law is appropriate in "those areas of judicial decision within which the policy of the law is so dominated by the sweep of federal statutes that legal relations which they affect must be governed by federal law having its source in those statutes, rather than by local law." *Sola Electric Co. v. Jefferson Electric Co.,* 317 U.S. 173, 174, 63 S.Ct. 172, 176, 87 L.Ed. 165, 168 (1942). Federal regulation of railroads spans almost a century. Although relatively few in number and narrow in scope at the beginning, federal statutes now governing the incidents of rail transportation number in the hundreds and are supplemented by volumes of administrative regulations promulgated by various agencies. The breadth and depth of that federal railroad regulation has resulted in the development of interstitial federal common law in a number of instances. This court does not doubt the power of Congress to encompass railroad tort liability questions within the scope of the federal law nor the power of the federal courts to declare a federal common law of railroad tort liability if necessary to effectuate the intent of Congress. Nonetheless, the question "[w]hether latent federal power should be exercised to displace state law is primarily a decision for Congress." *Wallis v. Pan American Petroleum Corp.,* 384 U.S. 63, 68, 86 S.Ct. 1301, 1304, 16 L.Ed.2d 369, 373 (1966). This court has been unable to discern any affirmative congressional action to displace state law on the issue of comparative and contributory negligence, and all indications of congressional intent lead to a conclusion that Congress has chosen *sub silentio* not to do so. Accordingly, this court concludes that federal law does not preempt the applicable law of the states governing comparative or contributory negligence standards. In view of this conclusion, this court need not reach the second

step in the *Clearfield* analysis: a consideration whether the content of the preemptive federal law is to be found through the incorporation of state law doctrines or the declaration of a uniform federal rule.

In summary, the narrow question before this court is whether federal regulation of interstate transportation governing railroads and hazardous materials is such that federal law should be deemed to preempt state law governing the contributory or comparative negligence standards otherwise applicable to the instant action. This court concludes that the Federal Tort Claims Act does not preclude the application of such a preemptive federal common law in view of the terms of the Act and its necessary interrelation with the Supremacy Clause. On the merits, however, this court holds that federal law does not preempt otherwise applicable state law on comparative or contributory negligence standards.

IT IS SO ORDERED.